F. Nelson Breed, Administrator (Estate of Rosa N. Stewart) *vs.* Philgas Company.
William D. Foster *vs.* Philgas Company.

Maltbie, C. J., Haines, Banks, Avery and Simpson, Js.

Argued December 8th, 1933—decided February 6th, 1934.

*Raymond E. Hackett,* for the appellant (defendant).

*Richard S. Swain* and *Bradford Boardman,* for the appellees (plaintiffs).

Avery, J. On May 23d, 1932, at about eight p. m. daylight saving time, an explosion occurred in the

cellar of the home of the plaintiff Foster, as the result of which Rosa N. Stewart, a housekeeper employed by him, received burns from which she subsequently died. The plaintiff Breed, as administrator, brought an action to recover damages for her death; and Foster brought an action to recover for injuries to his house and contents. The plaintiffs in both cases alleged that an explosion of Philgas occurred in the cellar which caused the death of the maid and the injuries to the property; and claimed that the explosion was due to the negligence of the defendant. The two cases were tried together before a jury and verdicts returned in favor of the plaintiffs, from which the defendant has appealed, assigning error in the action of the trial court in failing to set aside the verdicts; and also errors in the charge and in a ruling upon evidence.

On the trial, at the close of the plaintiff's case, the defendant rested. From the evidence offered by the plaintiffs, however, the jury might reasonably have found the following facts: The plaintiff William D. Foster owned a dwelling-house, situated on Hoyden Hill Road, Fairfield, where he lived, and employed Rosa N. Stewart as a housekeeper. Some time prior to the accident, the defendant, under a contract with Foster, installed a system for the burning of Philgas, the defendant to supply the gas and service the system. The installation consisted of a gas cooking stove in the kitchen, a water heater connected with a boiler in the cellar, and a rigid piping system connecting these appliances to two separate storage tanks outside the building. Each tank, when full, contained enough gas to supply an average family for a period of a month. The tanks were placed within steel cabinets standing on top of the ground, side by side, which were from six to twelve inches from the north wall of the house. The rigid pipe from the system within

the cellar extended into each cabinet through a hole near the top for a distance of about two and one-half inches. To this rigid pipe was connected a flexible metal pipe, made of brass, connecting the rigid piping system extending into the cellar with the rigid piping of the tanks containing Philgas.

There was an excess length of flexible metal pipe to enable the defendant to raise and lower the gas tank in each cabinet and fill the same without disconnecting it from the system. When a gas tank was at rest within the cabinet, the flexible pipe lay in curves inside the cabinet. In replenishing the gas tank, it was raised by a jack and weighed, and the amount of gas therein determined by the weight. The tanks were filled from a wagon, the gas being at high pressure and in liquid form. On each tank was a valve to control the flow in the process of filling. There was also a valve by which the outflow into the piping system could be shut off; and, in addition to these two, there was an automatic valve, not manually controlled, on the top of each tank by which the pressure of the gas, entering the piping system, was regulated. A rigid pipe extended out of each container to a common supply pipe running horizontally along the northerly wall of the house. From the supply pipe, connection was made through the cellar wall to the stove and heater. It was possible for gas to flow through the supply pipe from one tank as far as the regulating valve on the other. The control valves of the tanks were so adjusted that the gas in the west tank would entirely flow out before that in the east tank would commence to flow. Each tank was enclosed in a cabinet upon the top of which was a hinged cover arranged to be locked. When this cover was closed, the valves and flexible metal pipe were entirely enclosed in the cabinet and could not be seen or touched.

The covers were kept closed and locked at all times except when the tanks were being serviced by the defendant, and the keys were at all times solely in its possession.

Between twelve and one o'clock on the day of the explosion, a service man of the defendant weighed and filled the westerly tank, and weighed the easterly tank and found that it was full. After weighing each tank, the lid on each cabinet was closed and locked by him. Thereafter, he went into the cellar with Rosa Stewart; they each lighted and turned off the gas in the hot water heater, and left the cellar. Rosa Stewart was employed by Foster to do the cooking and general housework. It was her custom to light the water heater in the morning before breakfast and again at night just before or just after dinner. There was a coal stove for cooking in the kitchen, on top of which she also heated water. This stove was not connected with the boiler in the cellar. On the day of the accident, she had a fire in the coal cook stove, and there was no evidence that she used the gas attachments that night. After she left the cellar with the defendant's agent, no attempt to light the gas water heater was made until about eight p. m. daylight saving time on the same day.

The Foster house was an old one. Some time prior to his occupancy, an addition containing the kitchen had been built onto the westerly end. There was no cellar beneath the kitchen but an excavated space about three feet deep. The north foundation wall of the original house was continued westerly to form the north foundation wall of the kitchen. The westerly foundation wall of the original house separated the excavated portion under the kitchen from the cellar. The latter had head room of about six feet four inches and contained the gas water heater. There was an

opening from the cellar through the westerly wall into the space under the kitchen about two to two and one-half feet square. The north side of this opening commenced at a point eight to ten inches from where the west wall and the north wall intersected. This hole was in existence at the time the Philgas system was installed by the defendant. The cabinets containing the tanks were situated on the outside of the north wall practically opposite the point where the north and west walls intersected. There was a perforated area with numerous holes in the north foundation wall under the kitchen about three square feet in extent. The easterly cabinet was located eighteen inches from this perforated area.

Philgas, otherwise known as protane, is a chemical combination of carbon and hydrogen, about one and one-half times heavier than air. It is odorless, colorless, invisible and highly inflammable. A mixture of 7.3 parts of gas and 92.7 parts of air is explosive, and the explosive range is from that point to a mixture of 97.6 parts of air and 2.4 parts of gas. Mixtures containing larger or smaller proportions of gas are inflammable. The location of the west cabinet was chosen and its distance from the north foundation wall was determined solely by the defendant, who also chose and determined the layout of the rigid piping system leading to the gas heater and the stove and the location of these appliances. The location of the easterly cabinet, which was installed about three months after the other parts of the system, was chosen solely by the defendant. Each cabinet had portholes located around its base, oval in shape, about six inches by three inches in diameter.

After the evening meal, on the day of the accident, Mr. Foster and his guests went for a walk. Rosa N. Stewart went downstairs to light the hot water

heater. An explosion occurred and she ran out of the cellar with her clothes aflame. She was taken to the hospital and died about four hours afterward. Immediately after the explosion flames were observed issuing from the easterly cabinet. Members of the fire and police departments arrived at the house from ten to twenty minutes after the explosion. One of the firemen knocked the padlock off the cabinet in which the gas was burning, and extinguished the fire by a chemical. Immediately a hissing noise was heard. The fireman turned the two valves on the top of the gas tank in the cabinet and the hissing noise stopped. Later, a large split in the flexible metal pipe and an abrasion on the opposite side were found.

The gas in the west tank was found to be practically exhausted, and the east tank practically full. In the main cellar of the house some gladiolus bulbs were observed to be burning by the firemen on arrival, and in the space under the kitchen some oakum. The door of the gas heater in the cellar which covered the burner was found closed, the gas shut off and the heater cold. To operate the heater, it was necessary to turn manually the control valve, there being no pilot light. The control valve was found closed. A burnt blue tip match was discovered on the cellar floor near the base of the heater, and a large box of matches of the same kind lay unburned nearby. Other than Philgas, there was no explosive material in the cellar at the time. Subsequent to the explosion, the piping system was tested and no leaks were found in the pipes or appliances within the house. The only leak in the system was that in the flexible metal pipe attached to the easterly gas tank inside of the easterly cabinet. The cabinets and tanks showed no signs of having been moved by the explosion.

If the jury believed these to be the facts, it could

reasonably have reached the conclusion that at the time of the accident, there was no leak in the piping system inside the house; and that the gas was not turned on in the cellar, but that there was a leak in the flexible metal pipe which had existed long enough to exhaust the gas in the west tank. In addition, the jury could reasonably have found from the testimony that Philgas, being one and one-half times heavier than air, tends to flow toward and along the ground somewhat as water flows, while at the same time there is a tendency for the gas to expand and dissipate itself, and that from the position in which the tanks were placed, the gas, escaping through the break in the flexible pipe, might reasonably have penetrated through the perforations in the wall of the cellar into the space beneath the kitchen, and thence through the opening in the west wall into the main cellar of the house in sufficient amount to create an explosive mixture.

From the facts in evidence, the jury could have reasonably inferred that the explosion was caused by the ignition of a match by the housekeeper to light the heater, and that the fire followed from the main cellar to the excavation under the kitchen and out through the perforations in the wall into the easterly tank container. These facts, if found, amply warranted the conclusion that the explosion was caused by the leak and escape of gas from the flexible metal pipe within the east container. The jury might have reasonably reached the further conclusion that this gas was an inherently dangerous substance requiring the defendant to use a high degree of care in all its conduct with reference to the supply system, and that the defendant was negligent either in the acts of its servant in handling the containers when he filled them on the day of the explosion or in failing to dis-

cover the leak in the pipe. The court did not err in refusing to set aside the verdict.

With respect to the errors assigned in the charge, it is to be observed that no requests were made of the trial judge. The complaint of the appellant that the trial judge did not sufficiently instruct the jury as to the burden of proof is without merit. They were specifically informed that both plaintiffs had the burden of proving that the negligence of the defendant in one or more ways specified in the complaint caused their respective injuries; that the plaintiff Foster had the burden of proving that he was in the exercise of due care; that in the Breed case, the burden of proving that Mrs. Stewart was guilty of contributory negligence was on the defendant; and they were informed that the burden of proof required the plaintiffs to substantiate their allegations by the better or more convincing evidence. The charge of the court was adequate upon this phase of the case. It was not required that the court should inform the jury as to what is meant by an equipoise in the evidence. *Brodie* v. *Connecticut* Co., 87 Conn. 363, 364, 87 Atl. 798; *Hawken* v. *Daley,* 85 Conn. 16, 19, 81 Atl. 1053. The question of proximate cause was stated to the jury in accordance with our rules. *Mahoney* v. *Beatman,* 110 Conn. 185, 195, 147 Atl. 762; *Smirnoff* v. *McNerney,* 112 Conn. 421, 426, 152 Atl. 399.

The complaint that the court neglected to inform the jury that the plaintiffs could not recover if the accident was due to the sole negligence of Mrs. Stewart is also without merit, as there was no evidence in the case from which the jury would have been warranted in finding any negligence on her part. Nor can we sanction the contention of the appellants that § 598a of the Public Acts of 1931, which imposes the burden of proof of contributory negligence upon the

defendant in death cases, is so limited in its scope as to apply to the period immediately incident to the time of the accident, leaving the burden of proof upon the plaintiff except for that immediate period. The language of the statute (General Statutes, Cum. Sup. 1931, § 598a) is: "it shall be presumed that such person was, at the time of the commission of the alleged negligent act or acts, in the exercise of reasonable care;" and the presumption thereby created is available to the plaintiff throughout the entire period of the transaction. This necessarily imposes upon the defendant the burden of proving some negligent act or omission on the part of the decedent which materially contributed to the injury, and unless such burden is met, the plaintiff must prevail upon that issue of the case.

It remains to consider the ruling on evidence—the hypothetical question which was somewhat inartificially expressed. The sole grounds of objection, however, made at the trial were that there was no evidence that gas had escaped through the break in the pipe, and that the question failed to include certain conditions which the defendant felt to be relevant. The first ground is patently unsound. As to the second, the subsequent examination of the witness fully covered these matters in their bearing upon the opinion he gave.

There is no error.

In this opinion the other judges concurred.