NANNIE CLAY, APPELLEE, v. THE BUTANE GAS CORPORATION, A CORPORATION, APPELLANT.

39 N. W. 2d 813

Filed December 6, 1949. No. 32637.

*Joseph B. Fradenburg* and *Ferne A. Fradenburg,* for appellant.

*Chambers, Holland & Groth,* and *George B. Boland,* for appellee.

*Fremont Meyers* and *Roy M. Byram,* amici curiae.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, CHAPPELL, and WENKE, JJ.

MESSMORE, J.

This is an action at law brought by the plaintiff to recover damages to a building owned by her caused by an explosion of butane gas alleged to have been due to the defendant's negligence, and for the loss of personal property located in the building. The case was tried to a jury resulting in a verdict in favor of the plaintiff. Upon the overruling of the motion for new trial, defendant appeals.

For convenience the parties will be referred to as designated in the district court.

The negligence charged against the defendant in the plaintiff's petition is as follows: (1) The failure of the defendant's truck driver to ascertain the conditions existing before delivering butane gas into an underground tank adjacent to the plaintiff's building and which serviced the product into the building; and (2) the delivery by the defendant of such butane gas into a storage tank when it knew, or should have known, that the storage tank was not in a safe condition to receive such gas. These allegations of negligence were denied by the defendant's answer. Such alleged negligent acts of the defendant were submitted to the jury.

The record discloses that on April 4 and 5, 1947, the plaintiff owned Lots 5 and 6, Block 52, in North Bend, Nebraska, upon which was located a one-story brick building. The building was 44 feet wide, 110 feet long, running east and west, and situated on a corner facing west. The building was rented by Charles and Wilson Emerson, sons of the plaintiff, and used and operated as a bakery and restaurant.

Any claims that the Emersons had by virtue of the loss of personal property have been assigned to the plaintiff.

There was a partial basement under living quarters which were in the rear of the building. The basement was 12 feet wide, 18 feet long, and 5 feet deep. The stairway to the basement was east of the kitchen, and the steps downward were adjacent to an automatic gas furnace located in the northwest corner of the basement approximately 10 feet from the south wall. The furnace was in operation on April 4 and 5, 1947. It went off and on at intervals of 15 minutes. The igniter in the fire box and the motor produced a spark, or flame, in the operation of the furnace. There was also a compresser in the basement that would go off and on every two hours or so, which would produce a spark or flame from an electric motor.

On the south side of the building the sidewalk extended to the curb, and in the center of the sidewalk was a manhole which covered a metal tank buried underground adjacent to the basement, with a water capacity of 218 gallons. Butane gas, which was purchased from the defendant, was put into this tank to service appliances used in the restaurant. The tank was equipped with a criterion gauge which registered the amount of gas in the tank, and a pressure gauge which registered the pressure. There was also a regulator that fit onto the line between the storage tank and the appliances. The gas came into one side of the regulator at 35 pounds pressure and was reduced to 6 ounces of pressure, which was the amount of gas necessary to operate the appliances used in the restaurant. There was a screw valve on the transmission line which was manually operated to discontinue the flow of gas if desired, generally located between the storage tank and the regulator. There was also an automatic shut-off valve placed in the transmission line so that in the event of failure of equipment resulting in a rush of gas to the valve, the valve would

automatically shut off. There was a galvanized pipe about one-half inch in diameter which led from the tank into the basement, and copper tubing leading upstairs to the kitchen where the outlets serviced a gas range, steam table, and automatic dishwasher.

Butane gas is a manufactured product, a liquefied petroleum gas which is between gasoline and natural gas. It is inflammable, explosive, has a distinct odor, and is very volatile. It boils at approximately 26 degrees above zero. It has 3,300 B. T. U's per cubic foot for heat value. It is heavier than air and sinks below the surface of water. The gas is transported in trucks in liquid form and must be handled with the same type and degree of care as gasoline.

On April 4, 1947, Charles Emerson was working on the evening shift and noticed that there was insufficient pressure in the gas range to cook with. He went outside, checked the gauge on the tank, and found that they were out of butane gas. He called the defendant corporation at Omaha, made inquiry for someone in charge, and contacted Mr. Reitan who was a salesman for the defendant. He informed the salesman that they were out of gas, and was told by him that it would be impossible to deliver gas to them right away. Emerson asked the salesman if he could call Wahoo to see if their truck would come over, and was informed that propane gas, due to its pressure, would not work in their stove. Emerson then told Reitan that bottled gas could be obtained in North Bend, and was informed by Reitan that it was all right to hook up the appliances, that the pressure was all right. Emerson then told Reitan that he would go to the hardware dealer and have him hook up the bottled gas, and Reitan stated that they would be out in the morning and fill the tank with butane gas.

After the conversation with Reitan, Emerson went to the hardware dealer and asked about getting gas to run the range. He was asked by the hardware dealer if he had permission from the gas company to hook on to the

bottled gas which he could furnish. Emerson told him he had just finished talking to the representative of the defendant, and it was all right to hook on a bottle of gas. A man was sent over to deliver the gas and hook it up. To do this, the valve at the main tank was turned off. The connections from the tank which led upstairs to the appliances were broken, and connections were made from the bottle to the main line. The gas was turned on from the bottle, and the joints and the appliances tested at the places where the connections were made. The pipe which came down from the large butane tank was tested by putting and holding a lighted soda straw next to it to see if there was any flame. There was none, and no sign of gas coming out. The connection between the line and the butane tank was just inside the foundation of the building in the basement, about four feet from the basement floor, and two feet beneath the basement ceiling.

Additional tests were made about two hours later in the evening by the hardware dealer who stopped in and inquired as to how the gas was working. He found that it worked nicely. He inquired if his man had tested the joints and was informed that he had, and that Emerson was with him at the time the tests were made. The hardware dealer then suggested that another test should be made to be sure, explaining that bottled gas had more pressure than the gas in underground tanks. He and Emerson went down and tested all the joints downstairs, came back up and tested the joints upstairs. These tests were made with matches, and there was no sign of gas coming in. The outside tank was also tested.

The hardware dealer also testified with reference to the mechanism which led from the butane tank, that the valve is of metal set in rubber which screws down into a rubber socket to make it gas-tight. He stated that the line was not cut off, but it was disconnected by being unscrewed. When the valve was shut off, the pipe was not capped.

The bottle which contained the gas furnished by the hardware dealer was bullet shaped, about four feet in height and one foot in diameter, with a regulator on top of it. It was a 25-gallon tank containing 100 pounds of pressed gas. It was placed in full view on the outside of the building approximately four or five feet from the manhole where the butane gas was put into the tank. This gas was used that evening and the next day.

The witness Reitan testified to receiving a telephone call from the Corner Cafe at North Bend on April 4, 1947, wherein he was informed that they were out of gas or the same was low in pressure, and they wanted to know how soon the defendant could get a truck out there. Reitan told them that he was not in charge of the trucks but would endeavor to get the man in charge of delivery service or one of the truck drivers, and as soon as he contacted somebody who handled deliveries, he would call back. He endeavored to contact the person in charge of deliveries, but was unable to do so. He informed Emerson that it would be 9 or 9:30 that night before a truck could get there. Emerson informed him that that would be too late, as they were out of gas and it was during the evening meal and they needed gas then. He also told him that a man at North Bend would hook up some gas since they could not deliver until the next morning. Emerson asked if the bottled gas would work in their appliances, and Reitan told him that it would. Reitan notified the service manager the next morning that the Corner Cafe at North Bend needed gas, and that they were hooked up with bottled gas temporarily. The service manager instructed one of the truck drivers to go to North Bend and deliver gas to the Corner Cafe, and told him that they were on the bottled gas temporarily, meaning, of course, that they were using gas from a different set-up.

The truck driver so informed, testified that he came to work at 8 o'clock on the morning of April 5, 1947, and the service manager told him that the Corner Cafe

at North Bend was out of gas and that they had a bottle hook-up for temporary service. He loaded the truck with butane gas and proceeded to North Bend, accompanied by another driver who was recently employed, to acquaint him with defendant's service. He arrived at North Bend at 11 a. m. Arriving at the Corner Cafe in North Bend he observed the bottle gas tank on the sidewalk, sitting up against the south side of the building. He lifted the manhole cover in the sidewalk where the connection with the butane tank was located. He got down on his knees to close the valve which was about three feet beneath the surface, and it was closed. He took the hose from his truck and filled the underground tank with 178 gallons of butane gas. The tank was filled to 93 percent of capacity, leaving room for evaporization. After the tank was filled, he checked all of the gauges to see that everything was all right. He also testified that the odor of butane gas is similar to spoiled cabbage and onions, and remains on clothing and other articles for some time. When he made the observations and tests, he found to his satisfaction that the valve had been screwed down as far as he could get it. The criterion and pressure gauges were at zero. It took about 10 to 12 minutes to fill the tank with the liquid gas. When there is an appreciable amount of liquid in the receiving tank, a pressure is built up inside of the tank. He figured the bill, went into the cafe, and there met Wilson Emerson. While Emerson was making out the check in payment of the bill, he asked him if he desired to have the gas changed over to butane, and was informed that they wanted to use the bottled gas because it produced a much higher flame than butane. When Emerson finished making out the check he invited defendant's driver into the kitchen to show him the flame produced by the bottled gas. The driver was explaining to him that the regulator on the butane equipment did not work properly and because of its defective condition the pressure of the butane gas was reduced. At that

time, after he had been in the restaurant about five minutes, the explosion occurred. There was a kind of a puff, a terrific blow, and quite a bit of pressure. He observed the panel between the storeroom and dining room, from the ceiling down to another wall which he took to be a plastic cardboard or heavy wood, as it was blown off into the dining room. He then rushed outside, as did Wilson Emerson. When they reached the outside they checked the valve and the tank and found that the valve was closed. The fire alarm was turned in, and the driver got into his truck and drove it across the street.

The explosion awakened Charles Emerson who lived in the building. He dressed and left the building. He observed flames in the basement through a floor register above the basement.

Wilson Emerson testified that when the explosion occurred the skylight was blown off its foundation. There was a suction fan attached to it which fell to the first floor. A partition on the north side of the kitchen was blown out, and glass fell out of the skylight. All of the studdings in the living quarters were badly burned. He also testified that he had no conversation with the defendant's driver with reference to reconnecting the butane system.

The chief of the fire department and the assistant chief testified that when they arrived at the scene of the fire the building was filled with dense smoke, and the fire was located in the basement. The assistant chief testified that it was difficult to describe the degree of smoke. Due to the size of the basement and the location of the joists, it was difficult to get to the fire, and as a consequence two holes were cut in the floor. The flames were near the ceiling of the basement and it was necessary to pump five or six feet of water into the basement in order to extinguish the fire. After the fire was extinguished, the Schuyler fire department pumped the water out of the basement with a rotary

pump. This operation, from the time the equipment was set up until the job was finished, took about an hour and a half.

The assistant fire chief described the fire as being unusually hot, suddenly intense, and as a "raging inferno." The testimony of other witnesses with reference to the fire is that it was in the basement; the floor joists were badly burned; and the fire burned up into the living quarters.

The fire chief testified that, after the water was pumped down to where the pipe coming from the butane tank into the basement was located, two or three of the firemen were in the basement with the assistant chief who called to the chief, and told him gas was escaping from a pipe and to keep the people back. This witness observed that the floor joists were burned pretty badly, and the fire burned up into the living quarters, and they were in bad condition. He also testified that the skylight was not blown out, because he sent a man up to take it off; that the pipe which came through from the south wall of the basement was six or eight inches long; and the water was about three feet high above this joint when they started to pump. After the fire he went down into the basement and the pipe from the butane tank into the basement was capped.

The assistant fire chief testified that when the fire had ceased, he went into the basement and observed a copper pipe that came in from the south wall possibly a foot or so into the basement. He heard a hissing sound such as made by escaping gas, and observed the pipe on the south wall, in the southwest corner of the open pit. He checked it several times to make sure what was happening. He notified the other firemen who were guarding against fire upstairs, placed his hand over the pipe, and gave an order to obtain a cap so it could be put on the pipe. There was pressure, and gas was shooting out from the pipe.

Plaintiff testified that at the time of the explosion

she had just come out of the kitchen into the dining room to serve an order. It was about 11:30 in the morning. There was an awful noise, she looked up, the side walls fell in, and she ran out of the building.

The explosion occurred in a period of about 15 minutes from the time the driver started to unload the liquid gas into the butane tank. The exact time that it took to pump the water out, down to where the pipe from the butane tank came into the basement, is not shown. It is clear, however, that it would be much less than an hour and a half.

A witness for the defendant testified that the butane gas equipment includes an automatic shut-off valve, the function of which is to automatically shut off the gas in case there is a break in the line; and that on the equipment in question this valve was in perfect working order. He further testified that the pressure sufficient to close the valve is up to ten pounds; that the gas is required to be odorized; that according to the underwriters instructions and specifications in the handling of liquefied petroleum gases, all piping or tubing shall be tested after assembly and proved free from leaks at no less than normal operating pressure; and that when containers are not connected to the system, the outlet valves shall be kept tightly closed or plugged even though containers are considered empty. This witness also testified that an explosion of butane gas causes little, or a very light smoke, not a dark smoke but rather a brownish gray; that ordinarily an explosion of butane gas is caused by extremely slow leaks. When gas escapes at 8½ percent by volume it will not explode, but will explode if ignited with an electric spark, or providing there was a flame in the proper mixture. He further testified for the defendant that if gas was coming out of this pipe, water would seldom extinguish the flame; that even after the flow, the flame would continue to burn on top of the water similar to gasoline as it bubbles up out of water; and that if there was a

leak in the basement, as was brought out by the testimony to the extent of a hissing sound, the basement would be so full of gas that no human being could possibly go into it. He further testified that there was nothing to indicate that the leak was stopped, so it would have to continue for an hour and a half while they were pumping out the basement, and at such time the basement would be so full of gas that no one could breathe, especially if it was made into an explosive mixture in the period of twenty minutes that it took the man to unload the gas.

The plaintiff, on rebuttal, testified that upon the first delivery of butane gas after the fire, which was made in May, she noticed the defendant's driver in the dining room and asked what he was doing. He said he was delivering gas and had been down into the basement to fix it for sure. The driver's version with reference to that delivery of gas was that he went to the basement to connect the plaintiff's set-up to the butane system, upon request. He found the condition of the line to be that there was a piece of copper tubing that was probably squeezing at the end of the line with a fitting to the line. The copper tubing was cut off and squeezed in a vise and nothing could get through it. It was plugged, but not with a regular plug. He further testified that after he turned on the gas the fittings were tested to make sure they were tight. A new regulator was placed on the butane equipment. The tank and all appliances were owned by the plaintiff.

While defendant has failed to conform to rules of this court in the assignments of error in its brief, we conclude it has incorporated such assignments in its propositions of law.

The defendant's contention with reference to the first assignment of error is that the evidence fails to show that the condition of the underground butane tank, the pipe leading into the basement, and the valve attached as part of the equipment, were not the same after the

fire as before the fire, and the evidence admitted as to gas escaping from the pipe leading from the butane tank into the basement was incompetent and prejudicial to the defendant.

In this connection the defendant cites the following: "The broad general rule is that where there is no change in the condition of an appliance or the premises or the scene of an accident, evidence as to the condition of such appliance or place, either before or after the event in issue, is relevant and admissible to show its condition at the time of such event, provided it relates directly to the issue in question and is not too remote in point of time. But the evidence must relate closely enough to the time of the accident to make it apparent that the condition has not been changed or it must appear that the situation is one which is so constant or permanent that lapse of time will not make a material difference. Where the conditions have changed, evidence as to later conditions is not admissible." 20 Am. Jur., Evidence, § 306, p. 284. See, also, Johnson v. Palomba Co., 114 Conn. 108, 157 A. 902, 80 A. L. R. 441; Davenport v. Intermountain Ry. L. & P. Co., 108 Neb. 387, 187 N. W. 905.

The defendant refers to the evidence of the hardware dealer whose man connected the bottled gas with the plaintiff's equipment, disconnected the pipe running from the butane tank into the basement, and made tests for escaping gas, also to the evidence of the defendant's driver that the valve in question had been closed, which evidence tended to show that immediately prior to the fire the butane tank and equipment thereon were in proper condition. The defendant then makes reference to the testimony of the assistant fire chief who testified that the fire at one time was a "raging inferno" and in the immediate vicinity of the pipe and valve in question, arguing that under the circumstances the pipe and the valve would not be in the same condition as before the fire, as many things could happen by virtue of the

fire, such as a break in the pipe or burning of the rubber in the valve and changing the condition. The defendant therefore contends that the evidence objected to and admitted over objection is prejudicially erroneous.

We are not in accord with the defendant's contention. The plaintiff's evidence discloses that the pipe leading from the underground butane tank into the basement had been disconnected at a point six inches to a foot within the basement wall, and it was ascertained by the tests made before the explosion, by the use of lighted matches held close to the pipe, that no gas was escaping therefrom; and for almost a year subsequent to the fire the same valve was used by the plaintiff without difficulty. The fire chief examined the pipe in question after the fire and found it intact. There is ample competent evidence that the pipe leading from the underground tank into the basement and the valve were not damaged, which raises a reasonable presumption that they were in the same condition as existed before the fire. There is no evidence to show that the pipe or valve were altered in any manner between the time the butane gas was unloaded by the defendant's employee until the fire started some 15 minutes later. The principal evidence to which the defendant objects in such respect as constituting prejudicial error is that of the assistant fire chief, an eye witness, as to what he observed immediately after the fire.

The evidence was admissible, and its weight was for the jury. The defendant's contention is without merit.

The defendant contends that there is no evidence of negligence on its part for the reason that the tank, pipes, and equipment were owned and controlled by the plaintiff, therefore the defendant was under no obligation to make any inspection, but the duty was upon the plaintiff to ascertain that the system was in proper condition to receive the delivery of butane gas.

Generally speaking, a gas company which does not install, own, or control the pipes or appliances in a cus-

tomer's building is in no way responsible for the condition in which. they are maintained, and consequently is not liable for injuries caused by a leak therein of which it has no knowledge. This rule is followed extensively in this country. See, Clough v. North Central Gas Co., 150 Neb. 418, 34 N. W. 2d 862; Annotation in 138 A. L. R. 883.

The defendant cites the following: "The rule as to the legal duty of the gas company in reference to the escape of gas from service pipes owned and controlled by others on private property, which pipes have been properly installed and tested, does not extend to thereafter making inspection, unless the gas company has knowledge of a probable defective condition in such pipes, or has knowledge of circumstances rendering it probable that gas is escaping therefrom." Wilson, Jr. v. East Ohio Gas Co., 68 Ohio App. 490, 42 N. E. 2d 180, and cases cited therein.

The law imposes a duty on a gas company as follows: "Natural gas is a dangerous agency. Its distribution is accompanied by many possible dangerous consequences, and it is therefore well established that a higher degree of care and vigilance is required in dealing with such agency than is required in the ordinary affairs of life. A degree of care commensurate to the danger involved is required of a distributor of natural gas to avoid injury and damage and, in case of failure to exercise such care, and injury results, it is liable." Koch v. Southern Cities Distributing Co., 18 La. App. 664, 138 So. 178. See, also, Moran Junior College v. Standard Oil Co., 184 Wash. 543, 52 P. 2d 342; Fonda v. Northwestern Public Service Co., 134 Neb. 430, 278 N. W. 836.

The rule so announced applies to a gas such as butane gas or other manufactured liquefied gases of the same character or kind.

It is also the rule that a company engaged in the transportation and delivery of a dangerous fuel commodity such as natural gas must have employees efficient in

their line, and it is bound to anticipate injuries resulting from the use of such commodity. See, Fonda v. Northwestern Public Service Co., *supra*; Annotation in 138 A. L. R. 882.

It being common knowledge that gas is a powerful and dangerous force that requires care on the part of those furnishing it, a gas company which knows of the location of the tank, pipes, and cutoffs in a customer's building is under the obligation and duty, in filling the tank, to exercise that degree of care, to protect the building and its occupants from injury, commensurate with the dangers incident to the use of such gas. See Lane v. Community Natural Gas Co., 133 Tex. 128, 123 S. W. 2d 639.

While liability of a distributor of gas does not attach, in the absence of a reasonable basis for anticipating danger, that fact does not relieve the distributor from such diligent and adequate inspection of its transportation and service facilities where the reasonable basis to anticipate danger actually exists. See Sternbock v. Consolidated Gas Utilities Corp., 151 Kan. 81, 98 P. 2d 162.

Where a gas company is cognizant of facts which should indicate to it the possibility of accident it may be held liable even though the precise manner in which the harm resulted could not have been foreseen. See Sternbock v. Consolidated Gas Utilities Corp., *supra;* Annotation in 138 A. L. R. 880.

While the defendant was not an insurer of the safety of the plaintiff's premises or the personal property therein, and the law does not impose upon it the arduous duty of inspection in every case, yet when its agent has good cause to believe that an inspection should be made, it may be negligence not to inspect, and if so, it is liable for damages proximately caused by such negligence. See Lynchburg Gas Co. v. Sale, 160 Va. 783, 169 S. E. 577.

In the instant case the evidence discloses that the defendant was advised that the Corner Cafe at North Bend was out of butane gas and agreed and acquiesced

that the operators of the cafe would obtain bottled gas to continue the operation of the business; agreed that the bottled gas would work in the appliances used in the business; and knew that there would have to be a change-over from the butane system. The defendant further knew that its agent in charge of delivery had been told about the matter of the Corner Cafe being temporarily connected to use bottled gas, and the delivery manager so informed the driver who was to deliver the gas that morning. Further, the driver, upon arriving at the location of the Corner Cafe in North Bend, saw the bottle of gas leaning up against the side of the building and knew, as did the other agents of the defendant, that condition required a hookup separate from the supply tank which held the butane gas. The driver for the defendant knew that there had been some disconnection.

In Julian v. Sinclair Oil & Gas Co., 168 Okl. 192, 32 P. 2d 31, where the gas company contended since it was not the owner of the pipes at the point where the gas escaped it was not charged with the responsibility of inspecting such pipes and was not liable for injuries occasioned by faulty material which it did not own, the court said: "As we view it, this fact alone would not absolve the company from liability. The gas which caused the damage was defendant's gas, and was turned into the pipes by defendant with knowledge on its part that it was a highly dangerous substance and subject to escape. Through the duly appointed agents and employees, defendant was charged with knowledge that its gas was being transported through the pipes in question." The question as to whether the gas company had exercised such a degree of care and caution as was commensurate with the known nature of natural gas was held an issue of fact which under proper instructions should be submitted to a jury. The same, by analogy, would apply to butane gas in the instant case.

Under the facts adduced in the instant trial and the authorities cited, the defendant's employees, before fill-

ing the butane tank with an inflammable, explosive, and volatile gas, should have familiarized themselves with the conditions then existing with reference to the equipment and appliances to receive the same, when they knew that the butane gas tank had been disconnected. They made no inspection to ascertain whether the pipe from the butane tank leading into the basement had been disconnected, or whether gas was escaping therefrom.

"The responsibility of the gas company arises from knowledge of a dangerous condition and not by reason of the condition." Stephany v. Equitable Gas Co., 347 Pa. 110, 31 A. 2d 523.

We conclude that the evidence was sufficient to show negligence on the part of the defendant, and such negligence was a question for the jury under proper instructions.

Where a person occupies such a position in relation to another that a want of ordinary care will obviously cause injury to such other person a duty arises to use such care and thus to avoid causing injury. A gas company owes the duty to all lawful users of a building not to supply gas to the pipes in such building unless it has used care commensurate with the known dangers to see that such gas is properly regulated and controlled. See Southern Indiana Gas Co. v. Tyner, 49 Ind. App. 475, 97 N. E. 580.

The defendant contends that there is no proof that there was a fire caused by the explosion of butane gas.

In this connection it may be appropriately stated that under the evidence as heretofore detailed, the jury could have found that gas was escaping from the butane underground tank through the pipe which led into the basement; that the explosion could under the factual situation have been attributed to the escaping gas becoming ignited by one of the electrically operated motors in the basement; and that as a result of the explosion and following it, the fire occurred on the premises.

The evidence was sufficient to warrant the jury to have reasonably concluded that this gas was an inherently

dangerous substance requiring the defendant to use a high degree of care in all its conduct with reference to the supply system, and that the defendant was negligent either in the acts of its servant in filling the butane tank, under the circumstances, on the day of the explosion, or failing to discover the leak in the pipes. See Breed v. Philgas Co., 118 Conn. 128, 171 A. 14.

And, as stated in Fonda v. Northwestern Public Service Co., 138 Neb. 262, 292 N. W. 712: "The cause of an accident, like any other factor, may be proved by circumstantial evidence." In the afore-cited case a sufficient cause of the accident was shown, the circumstances indicated that inadequate inspection was made, and the gas company was held liable. On the same point, see also Sternbock v. Consolidated Gas Utilities Corp., *supra.*

A consideration of the evidence yields inference that the gas escaping from the butane tank and gas escaping through the distributing system was responsible for the conflagration, and that defendant, through its agents, was negligent in permitting the gas to escape. No testimony indicated the cause of the fire save only by reason of inflammable gas that unquestionably escaped from the tank and distributing system. On the contrary, the evidence is quite affirmative that the fire was caused by escaping gas. We believe that the record discloses evidence sufficient from which the jury could find that the gas company had notice of the dangerous condition existent, and if it did have such notice, it became a question for the jury whether or not it made proper inspection and repairs with reference to it.

For the reasons given in this opinion, the judgment of the district court is affirmed.

AFFIRMED.

BOSLAUGH, J., participating on briefs.