J. W. GABLE, Plaintiff-in-Error, v. TENNESSEE
LIQUEFIED GAS COMPANY, Defendant-in-Error.
—325 S. W. (2d) 657.

Western Section.　September 13, 1957.

Certiorari denied by Supreme Court February 6, 1958.

Richard Holmes, Hal Holmes, Trenton, for plaintiff in error.

Robert P. Adams, L. L. Harrell, Trenton, for defendant in error.

AVERY, P.J. (Western Section). This is a suit for property damage and personal injury damage in amount of $20,000, resulting from the explosion of butane gas in a building owned by plaintiff below, who is plaintiff in error in this Court, which explosion destroyed the building and injured plaintiff.

The parties will be referred to herein as in the Court below—plaintiff and defendant.

The defendant was the supplier of fuel to plaintiff's butane gas system, which was a system so constructed as that it furnished gas to plaintiff's home and his store building, which was the building destroyed.

The essence of the negligence charged in the declaration is that plaintiff discovered an odor of escaping gas in his store building and that at that moment he observed an employee of the defendant across the street servicing gas to another customer of defendant; that this employee, one Cozart, was called into the store building and observed gas leaking from a valve attached to the floor furnace and pipeline from the gas tank, and advised plaintiff "that the valve was defective and should be replaced", but that the employee oiled the leaking valve and stopped the leak, which oiling he stated "would render the operation of the heating system safe until such time as the company could replace the valve"; that the

plaintiff requested the said Cozart to replace the valve "if in his opinion same should be done and said Cozart agreed to return and replace the valve within a few days." The declaration alleges that the valve was not replaced as instructed, and agreed, and that this constituted negligence which was the direct and proximate cause of the explosion which occurred about six weeks later, causing the damages alleged in the declaration.

The declaration is in two counts, the first of which avers the property damage, and the second avers the personal injury damage.

To the declaration three pleas were filed. The first is a simple not guilty plea. The second is that the negligence of the plaintiff was the direct and proximate cause of his injury. The third is an assumed risk plea.

The plaintiff admits the ownership of the butane gas tank and all the equipment supplying both plaintiff's home and store from said tank with butane gas. The declaration alleges that defendant furnished plaintiff's system with gas from its tank wagon, putting it into plaintiff's tank, and inspected the system at proper intervals. Plaintiff admits that the gas put into the gas tank became his when placed into the tank. The particular installation, except the meter in the store building, had been installed in 1948 or 1949 by defendant.

The case was tried before His Honor, John F. Kizer, Circuit Judge, without intervention of jury, which had been called for but was specifically waived by both parties. At the conclusion of plaintiff's proof, the defendant without introducing any proof whatever "moved the Court for a judgment and verdict in its favor, which motion, being heard and understood by the Court, was

678

sustained, and to which action of the Court the plaintiff excepted.'' (R. 17)

The motion as made by the defendant is in the following words:

"If your Honor please, the defendant moves the Court for a directed verdict or to dismiss the plaintiff's suit, because, under the proof, the plaintiff has failed to make out any case of liability against this defendant.''

(R. 104)

Motion for new trial was seasonably made and overruled. Plaintiff prayed, was granted, and perfected his appeal to this Court, and has assigned errors.

The main building consisted of a basement and an upper story, each 20 x 40. The basement floor was of concrete and its walls of concrete blocks which extended about 18" above the ground surface. The upper section was frame and the inside walls were storm sheeted. The outside of the studs was covered with car siding to which was attached imitation brick composition siding. The overhead ceiling was regular 6" overhead ceiling boards.

The attic was insulated with rock wool insulation. The roof was solid decking covered with composition shingles. There was a large front door with plate glass 6 x 6 feet on each side of the door. There was a window on the east side about 3' square. On the west side, which was the one next to the dwelling, there was a door, and there was a window in the rear of the building.

At the back of the main building there was an addition 12 x 14' from which you could get into the basement without going into the main building. Just what sort of

entrance there was to the basement at that point is not shown. There were concrete steps from the ground up to the doors both on the side and the front. The basement had four transom windows, all closed.

The floor of the main building above the basement was wood. The ceiling in the main building was 9 or 9½ feet from the floor. There was an inside stairway affording entrance and exit to and from the basement to the main floor.

Plaintiff formerly used this building for a grocery business which had been discontinued about 12 months. There were used refrigerators, drink boxes, etc. in the building. Some plumbing pipe fittings for plaintiff's own use and for sale, were in the building.

To better understand the Assignments of Error, it should be said that the Trial Court was requested to file in writing a Finding of Facts. In response thereto, he filed a 4-page document titled "Findings and Conclusions". (R. 10 to 13 inc.)

In his "Findings and Conclusions", among other things, the Court said that the gas valve

"simply required lubrication as is common in all mechanical devices, and the defendant company was not put on notice of any defects."

He further found that —

"Even if it could be said that the Defendant was guilty of negligence, the court finds as a matter of fact that the plaintiff was guilty of proximate contributory negligence. He is an electrician by trade, and in addition, a part time plumber; he was well

aware of whatever dangers were involved, and he continued to use the gas furnace for a period of six weeks prior to the explosion without making any inquiry to the company as to when the valve would be replaced.'' (R. 12)

Plaintiff filed his ''Request for Additional Findings'' as follows:

''The Plaintiff, J. W. Gabel respectfully requests that the Court find in writing the following facts in addition to the finding heretofore filed.

(1) That the floor furnace purchased by Plaintiff from Defendant was installed by the Defendant.

(2) That after the installation the Defendant, at intervals, inspected and serviced the furnace, tanks and other installation.

(3) That as a result of the explosion the Plaintiff suffered damage to his building in the amount of Five Thousand Dollars ($5,000.00) and to his personal property in the amount of $————.''
(R. 14)

In the Decree, these requests are by reference made a part of the record and the Court specifically found the facts as requested in numbers 1 and 3 above, but declined to find the facts to be as set out in number 2 above.

Plaintiff's Assignment of Error I, divided into two parts, is simply that the evidence preponderates against the judgment of the Court as to the facts and the law.

Plaintiff's Assignment II is levelled at the action of the Court in finding that ''the gas valve simply required

lubrication as is common with all mechanical devices and the defendant company was not put on notice of any defects.''

Assignment III is that the Court erred in finding that ''the plaintiff was well acquainted with the dangers involved''.

Assignment IV is that the Court erred in refusing to find, as requested by plaintiff, that the ''defendant, at intervals, inspected and serviced the furnace, tanks and other installations''.

Assignment V alleges error because the Court found that the plaintiff was guilty of proximate contributory negligence.

Assignment VI is levelled at the action of the Court in holding that defendant was not negligent, is a reiteration of Assignment V, and that the Court erred in rendering judgment for defendant.

Assignment VII is that the Court erred ''in rendering a judgment for defendant and in refusing to render a judgment for plaintiff for the value of the building and the contents.''

All these Assignments of Error are discussed by the plaintiff in his brief, wherein he alleges that the Court predicated his decision upon these erroneous conclusions, and which counsel alleges to be as follows:

(1) There was no negligence on the part of defendant because it was not put upon notice of any defect in the fuel supply system which caused the leakage of gas which resulted in the explosion.

(2) Insufficiency of the proof to warrant the conclusion that the gas leaked from the defective valve, the only defective part of the system of which defendant had notice.

(3) Contributory negligence of the plaintiff based upon the theory that he should have been aware of the danger involved in continuing to use the system until such time as the defective valve had been replaced.

The essential findings and conclusions of the Court from the facts proven by plaintiff are:

That plaintiff purchased the floor furnace, the butane gas tank and equipment from defendant and the defendant installed all this equipment; that he purchased the liquified gas for use in the system from defendant; that some six weeks prior to the date of the explosion, plaintiff detected the odor of gas in the building and by chance happened to see a service truck belonging to defendant cross the street servicing another customer, and called defendant's agent, one Cozart who was in charge of the truck, requesting that he check this equipment, which he did, and found that a part of the "feeder valve was stuck" and that Cozart

"oiled the valve and it worked satisfactorily. Mr. Cozart struck a match and held it around the valve to satisfy the plaintiff that the valve was functioning properly and that no further gas was escaping. At that time Mr. Cozart informed the plaintiff that a new valve was then on the market which would give more satisfactory service than the one in use and inquired as to whether or not the plaintiff would like for him to install such a valve the following day.

The plaintiff instructed Mr. Cozart to return and install the new valve. Mr. Cozart did not return on the following day, and the valve had not been replaced on the date of the explosion. The plaintiff knew this. He had been in Dyersburg at least on two occasions subsequently, and before the explosion took place, and had never contacted the defendant company about the new valve.

"On the morning of May 7, 1954, he entered the building and detected the odor of gas. He went immediately to the rear of the building to cut off the gas connection at the supply tank, but, before he could do this, an explosion occurred, which, with the resulting fire, demolished his building and destroyed most of the contents thereof. The plaintiff testified that he did not know whether gas was escaping from the valve in question, but he thought that it must have been." (R. 11)

The Court further found that:

"* * * while the evidence establishes conclusively that the explosion was caused by escaping gas, it is left to the realm of speculation as to whether the gas escaped from the valve in question." (R. 12)

The Court also found that the plaintiff was engaged in the business of an electrician and part-time plumber, and that the entire equipment, including the gas, was the property of the plaintiff. He also found that the plaintiff knew the valve in question had not been replaced and that after his conversation with Cozart about the valve and prior to the explosion, plaintiff had been to Dyersburg on two occasions where the office and business of

defendant was located and had not contacted the defendant company about this new valve.

The Court also found that:

"On the morning of May 7, 1954, he entered the building and detected the odor of gas. He went immediately to the rear of the building to cut off the gas connection at the supply tank, but, before he could do this, an explosion occurred, which, with the resulting fire, demolished his building and destroyed most of the contents thereof. The plaintiff testified that he did not know whether gas was escaping from the valve in question, but he thought that it must have been." (R. 11)

The Court then referred to the facts and rules laid down in Cleveland Gas Co. v. Woolen, Tenn. App., 205 S. W. (2d) 754; 38 C. J. S. Gas sec. 47c (1); Chattanooga Gas Co. v. Underwood, 38 Tenn. App. 142, 270 S. W. (2d) 652; Evans v. Young, 196 Tenn. 118, 264 S. W. (2d) 577, and Kidd v. Tennessee Gas Co., 33 Tenn. App. 302, 231 S. W. (2d) 793, and said that:

"It is the opinion of the Court that applying these rules to the facts enumerated herein, the plaintiff has not carried the burden in proving the facts constituting a cause of action of this nature. The court finds that there was no negligence on the part of the defendant company because the feeder valve was not per se defective. It simply required lubrication as is common in all mechanical devices, and the defendant company was not put on notice of any defects, as such, in the supply system; Even if it could be said that the Defendant was guilty of negligence, the court finds as a matter of fact that the plaintiff was

guilty of proximate contributory negligence." (R. 12)

In addition to the admitted facts set out hereinabove, the proof shows that about a year after defendant had installed plaintiff's liquified gas system, plaintiff discovered an odor of escaping gas on the outside of the building, called an employee of defendant who found that the gas was escaping from a valve located in the pipeline outside of the building and that defendant took this valve off and replaced it with another. There is no proof whether the plaintiff paid for this service or not.

The plaintiff stated that after the gas had been cut off in the summer and was turned on for winter use, the defendant inspected the installation, if he requested it. He also stated that at one time he took a meter off the gasline that went into the residence and installed it on the outside of the store building, but that after he did that he got the defendant to inspect the work and that they did what he called "soap tested it", that he saw them "make up soapsuds and put on it". (R. 51) He stated that he had turned the gas off at one of the main valves before making the installation and then had them test it when the gas was turned into that pipeline. (R. 52)

His testimony with respect to what happened when he first discovered gas odor in the building is that it was on a Sunday morning and, as he remembers, it was in the month of March. He saw Cozart at the Jones' place, went over there and told him about the odor and that Cozart went immediately with him back into the building and into the basement and on up where the floor furnace was connected; that Cozart struck a match and stuck it up to the valve and the flame would go up and go out; that

this test showed that there was a small leak; that Cozart asked him for some oil and he told Cozart he had some pipe oil which he gave to Cozart, that Cozart put this pipe oil on the valve, after which he worked something about the valve up and down and then made another test with the match and found that no gas was then escaping. On cross-examination, he was asked and answered:

"Q. 200. What was it you say again he said it was after that, after he match-tested it and there was a leak there? A. He said something about that was a different type valve than they were using now, something of that nature, he went on to explain something to me, and I don't know the exact words— something about them getting hard and being greased.

"Q. 201. That is all he said? A. And he said that the valve could be replaced, should be replaced, and I said if that is what it needs, that is what I want.

"Q. 202. That was six weeks beforehand? A. That is right—I guess it was.

"Q. 203. At least six weeks? A. Yes.

"Q. 204. And you saw him match test it and knew that it wasn't leaking after he did what he did? A. I would say that it wasn't leaking then,—yes, sir.

"Q. 205. You knew any new valve or anything new about it, you had to pay for it. A. No, they hadn't been charging me for it.

\*    \*    \*    \*    \*    \*

"Q. 208. Say again the exact words—what he said? A. He said that there was something about

that valve was different to the one they use now, I don't know the exact word he said, he explained to me about that. I couldn't tell you exactly what type of valve he was talking about, but he said something about that valve got hard and needed some oil, he explained that to me. He recommended—I don't know the exact word—he recommended putting another valve on, and said he was coming back to Mr. Jones the next day to do some work over there and would take care of it." (R. 57, 58)

He then admitted that he had never called defendant company nor anybody connected with it during the interim, and explained this as follows:

"Q. 211. And never did call Mr. Davis? A. He assured me right then that it was not leaking, and I thought it was all right and that they would go ahead and fix it and really the next day I don't know whether he come or not. I probably asked my wife, but I don't know whether I did or not.

"Q. 212. You and he both thought that when he stopped that leak, with the match test, that it was O.K., you thought so and he thought so? A. He told me and it wasn't leaking right then."

Plaintiff was not certain whether he had cut the gas entirely off the pilot light after Cozart had made the test and oiled the valve and then had turned it back on before the explosion, on account of intervening warm weather. He explained that turning off this pilot light was done from a lever or knob on the top floor of the building. (R. 59)

His version of what occurred between him and the company's agent Cozart, as given on cross-examination, is in substance the same as he had given on direct examination.

On cross-examination, when questioned about the debris that was left after the explosion and fire, and about the walls of the upper part having blown out and the roof having fallen in on the floor, he gave as his opinion that some of the floor must have blown up also, because he had a "scotch for the door, the front door" that fitted into a piece of plank in the floor and that he found this scotch which was also a piece of plank, and the piece of plank into which it fitted, after the store had burned. His exact statements on cross-examination in this regard are as follows:

"Q. 81. And the first floor remained intact? A. No, sir, I wouldn't say it did, I don't know, I wouldn't make no statement on that, because I don't know.

"Q. 82. Didn't you say it burned? A. Yes.

"Q. 83. You saw it burning? A. I saw some smoke coming out of it and I left.

"Q. 84. The roof fell? A. It looked like it was just about that high.

"Q. 85. What I mean, the first floor wasn't blown out of the building? A. Well, some of it was bound to have been.

"Q. 86. I am asking, was it? A. I had a piece of plank that I know come out of it from the front, because I had a scotch for the door, the front door, and

the scotch and that piece of plank was about that long, and I found it.

"Q. 87. You found it after it was burned? A. Yes, it was done off." (R. 46, 47)

He explained that two of the Davises from the defendant company came to see him the day after the fire and that on that occasion they stated in effect that Cozart had told them about the leaking valve after the explosion and that he had forgotten to tell them. His exact statements are these:

"Q. 275. At no time did you call Mr. Davis or any one any more after that to come over there to see about it? A. No, sir, I didn't call them.

"Q. 276. You didn't call them at all? A. No, sir.

"Q. 277. You never did tell either of the Messrs. Davis here that you had had Cozart to come over there that Sunday? A. I don't remember ever seeing them.

"Q. 278. Well, the next day after this accident, they came over there and heard you was hurt and came to see you? A. Yes, and they told me then that they knew about the valve, he told them after the explosion." (R. 65)

He stated that he had helped the employees of the defendant install a similar type furnace in his living room the fall before the trial and that while it was similar to the one in the store, it looked like there was some difference and that the ones who helped him put it in had told him that there was some difference. He said he had some trouble with that installation immediately after

it was put in and that he had cut the gas off and they came back and fixed it and he was using it in his living room at the time of the trial.

The substance of plaintiff's testimony with respect to what he discovered just before the explosion and what occurred is simply that he went in the side door of this building to get some pipe fittings and that from the action of his cigar lighter which he used in lighting his cigar in the basement, he thought gas was escaping and that he went forward toward the furnace and there he smelled the gas stronger; that he wanted just two pipe fittings, a nipple and a union; that he picked them up with some pipe dope and walked right out intending to set them on the end of the porch and go cut the gas off at the tank and that this explosion occurred when he was 25′ away from the building. He explained that his cigar lighter "sputtered like there was something in the air". He does not remember whether he lighted his cigar, but he immediately closed the lid of the lighter, went nearer to the furnace where he smelled the fumes very strong and stated that in his opinion, while he could not say the gas was escaping from the valve, it was escaping from somewhere around the furnace.

We have several reported cases in Tennessee dealing with negligence in the distribution of natural gas and particularly, where the distributor owns the distribution facilities up to the point of consumption, but we do not have reported cases dealing with the negligence of a distributor of fuel usually termed "butane or propane gas".

In the instant case, we have an explosion that is said to have resulted from butane gas escaping from a defective valve in a basement. The physical facts indicate

that the exerted force of the explosion was against the walls of the upper story, carrying them outward and letting the roof of the building descend to the floor. If the explosion occurred in the basement, to have caused the effect on the walls of the upper story, the force of the explosion in the basement against the concrete block basement wall would have had to be sufficient to cause an ascension of this explosive force up the stairway from the basement, in order to have produced the effect to the building as shown by this record.

This perhaps would not be true except for the fact that propane gas is heavier than air. When it escapes through a valve or some opening through which force has caused it to vaporize, it descends rather than ascends. If the gas had been lighter than air, it would have ascended into the upper section of the building through the opening afforded by the stairway to the basement, or the louver above the floor furnace, and it might have come into contact in that upper section with some defective electrical wiring which would have caused an explosion in the upper section, and thereby forced the walls of that section outward.

■ In Seward v. Natural Gas Co. of New Jersey, in an Opinion by the Supreme Court of New Jersey, Appellate Division, 1950, 11 N. J. Super. 144, 78 A. (2d) 129, 133, the Court said:

"Propane gas takes a gaseous form at normal temperatures and is kept in liquid form at such temperatures by application of pressure. In its pure form it is colorless, and odorless. An odor is supplied by the introduction of a mercaptan, usually ethyl. One of the properties of the gas, already mentioned and of

significant importance in the circumstances of this case, is that it is 'about a little over one and a half times as heavy as air' so that, according to plaintiffs' expert chemist, 'it will sink' 'if the gas comes into the presence of air into a room, both being at the same temperature.' ''

■ In Clay v. Butane Gas Corporation, in a decision by the Supreme Court of Nebraska, 1949, reported in 151 Neb. 876, 39 N. W. (2d) 813, 816, the Court said:

"Butane gas is a manufactured product, a liquefied petroleum gas which is between gasoline and natural gas. It is inflammable, explosive, has a distinct odor, and is very volatile. It boils at approximately 26 degrees above zero. It has 3,300 B.T.U.'s per cubic foot for heat value. It is heavier than air and sinks below the surface of water."

In Skelly Oil Co. v. Holloway, 1948, 171 F. (2d) 670, 676, the U. S. Court of Appeals, 8th Circuit, in a case from the State of Missouri, in describing the qualities of propane gas said:

"It is 1½ times as heavy as air, and escaping, it tends to settle down or seek the lowest level."

In Breed v. Philgas Co., 1934, in an Opinion by the Supreme Court of Connecticut, reported in 118 Conn. 128, 171 A. 14, 15, by Judge Avery of that Court, it was said:

" 'Propane,' is a chemical combination of carbon and hydrogen, about one and one-half times heavier than air."

Each of the above cases is a damage suit, dealing with damages and injuries resulting from the explosion of propane gas. In some of them the gas escaped in a basement.

■■ The cause of an accident, like any other factor, may be proven by circumstantial evidence, but we cannot find an inference from evidence and draw another inference upon it, and thereby determine that a party is guilty of some act of negligence creating a liability. If, however, from the facts and circumstances proven, the cause can be determined as a fact, then from that fact another fact may be reasonably inferred with respect to the negligence of either party to the suit.

In Everett v. Evans, 30 Tenn. App. 450, 207 S. W. (2d) 350, 352, in an Opinion by Judge Felts of this Court, it was said:

"(2, 3) A case may be made out by direct evidence, circumstantial evidence, or by a combination of direct and circumstantial evidence. If the evidence for plaintiff, together with all the reasonable inferences therefrom, made her theory more probable than any other, this was enough to take the case to the jury and to support the verdict. Law v. Louisville & N. R. Co., 179 Tenn. 687, 699, 170 S. W. (2d) 360; New York Life Ins. Co. v. Nashville Trust Co., 178 Tenn. 437, 159 S. W. (2d) 81; Bryan v. Aetna Life Ins. Co., 174 Tenn. 602, 130 S. W. (2d) 85; Phillips v. Newport, 28 Tenn. App. 187, 187 S. W. (2d) 965.

"But if the evidence for plaintiff, together with all such inferences therefrom, made her theory no more probable than the contrary of it; if such evidence and

inferences left it a matter of equal probability whether plaintiff's injuries were caused by defendant's negligence or by some other cause for which he would not be responsible; that is, if it was a matter of speculation and conjecture how the accident happened, then a verdict should have been directed for defendant. Buckeye Cotton Oil Co. v. Campagna, 146 Tenn. 389, 242 S. W. 646; Pennsylvania R. Co. v. Chamberlain, 288 U. S. 333, 53 S. Ct. 391, 77 L. Ed. 819; Nichols v. Smith, 21 Tenn. App. 478, 489, 111 S. W. (2d) 911, 918; Willis v. Heath, 21 Tenn. App. 179, 186, 107 S. W. (2d) 228, 233; Phillips v. Newport, 28 Tenn. App. 187, 187 S. W. (2d) 965, 971.''

Prosser on Torts—1941—at page 291 defines circumstantial evidence as follows:

''Circumstantial evidence is evidence of a fact or set of facts from which the evidence of another fact may be reasonably inferred. It involves not only the assertion of witnesses as to what they have observed, but a process of reasoning by which a conclusion is drawn. Negligence may, of course, be proved by circumstantial evidence. The testimony of eye witnesses of the actor's conduct is not required and it may be inferred from the proof of other facts and circumstances.''

In the three cases referred to in the Opinion of the learned Trial Judge, the distributor or supplier of gas owned all the facilities through which the gas was distributed into the premises of the plaintiff.

In Cleveland Gas Co. v. Woolen, supra, and Chattanooga Gas Co. v. Underwood, supra, and clearly stated in 38 C. J. S. supra, the rule there laid down is said to be:

"In an action for injury resulting from an escape or explosion of gas, the burden of proof rests on plaintiff to prove the facts constituting his cause of action. Hence plaintiff must prove that the cause of the injury was escaping gas, that such gas belonged to defendant company, that it escaped through the negligence of the company, that it accumulated in the place where the injury occurred, and that defendant's negligence proximately caused the damage. *It is not necessary, however, for plaintiff to show how the gas became ignited."* [205 S. W. (2d) 756]

■■ Of course, that entire rule cannot be applied in such as the instant case. Neither the tank nor the pipeline from the tank to plaintiff's premises, nor the gas in the tank or pipeline, belonged to defendant. So that the proper rule to be laid down in such a case as we now have under consideration, can be deduced from the above quoted rule by deleting certain parts of it and by inserting applicable clauses. With this in mind, the rule in such case as we now have under consideration is this:

In an action for injury resulting from escape or explosion of gas, the burden of proof rests upon the plaintiff to prove the facts constituting his cause of action. It is the duty of an individual who owns his own gas tank, pipelines, gas and appliances that conduct liquefied gas to his premises, to keep in repair such system where the only service performed by the gas distributor is that of putting the gas in the tank so owned, unless by contract, express or implied, the distributor had undertaken to inspect and keep in repair such a system or had knowledge that such system was in such condition as to be unsafe and continued to supply gas into such tank with

such knowledge. It is not necessary, however, that plaintiff show how the gas became ignited.

The question of proximate contributory negligence on the part of plaintiff is always one for consideration.

■ In reaching our proper conclusions in this case, we must remember that we are considering the judgment of the Trial Court which saw and heard the witnesses, their manner and demeanor, and determined the case without intervention of the jury. Therefore, the hearing before us is de novo, burdened with the presumption that the Trial Court is correct unless the preponderance of the evidence is against it. T. C. A. sec. 27-303.

In Perry v. Carter, 188 Tenn. 409, 219 S. W. (2d) 905, 906, the Supreme Court referring to Code Section 10622, which is now T. C. A. sec. 27-303, said:

"(1, 2) Under the Code Section last above referred to the Court of Appeals must try the case 'de novo, upon the record from the court below', supported by the presumption that the judgment of the trial court is correct as to the factual situation if the evidence is in equipoise. If, in the judgment of the Court of Appeals, the evidence preponderates against the finding of the trial court the presumption as to its correctness vanishes and the Court of Appeals must enter such judgment as it deems the preponderance of the evidence warrants."

■ Taking the evidence of the plaintiff and analyzing it in relationship to the charge of negligence alleged in the declaration against the defendant, we find from all the circumstances as a fact that gas was escaping from the valve in question on the Sunday when plaintiff called

Cozart, defendant's employee, into the basement and he examined the alleged defective valve. We also find as a fact that to make this valve properly work at that time it had to be oiled or greased, and that defendant's employee did oil it on that occasion, then tested it, and found that it was not leaking after the application of the oil. We find as a matter of fact that he informed plaintiff, on that occasion, that the questioned valve was no longer being used and that the plaintiff should replace it with the better type of valve. We also find as a fact that defendant's employee agreed to replace that type valve with the new type valve the next day. Upon the evidence and circumstances we find as a matter of fact that he did not do so nor had he replaced that valve at the time of the explosion which occurred some six weeks later. We find as a fact that plaintiff had instructed Cozart to replace the valve if he thought that was what was needed. We find as a fact that the time for replacement was fixed as the day following that conversation, all of which was understood by the plaintiff. We find as a fact that plaintiff knew the valve had not been replaced, and that he continued to use that valve which defendant's servant had told him was not a proper type valve and had told him that it would be safe to continue to use it until he replaced it. We find as a fact that this notice to the employee was notice to the company or his employers, and from the conversation between the two Davises connected with the company and the plaintiff, after the explosion, it can be inferred that Cozart failed to inform his employers about the alleged defective valve, if in fact it was defective. From the circumstances and proof, we find as a fact that the gas which was in some way ignited and exploded, destroying the plaintiff's building

and injuring him, escaped through the valve in question, but it cannot be determined from this record who or what ignited it. It did not ignite, at least to an explosive capacity, from the cigar lighter of the plaintiff. We also find that the plaintiff was an electrician and a practical plumber. He knew that it was dangerous for the gas to escape from the pipelines, valves, or appliances. He knew that it was explosive when it came in contact with flame, and while he knew that Cozart had told him that the oiling would safely permit him to use the facilities until he returned with the other valve, that return date was fixed for the next day according to his own evidence, so that he knew, if he relied upon what Cozart had said, that Cozart did not intend to say that the valve was safe for use to some indefinite period, even later than the next day. He continued to use the system, and by his own admission shows that he was in the town where the office and the distributing plant of defendant was located, on at least two occasions between the time Cozart had informed him about the insufficiency of the valve and the date of the explosion. We find as a fact that he knew how to cut the gas off from his store building without cutting it away from his dwelling. He knew how to cut off the flow of gas from the tank to both places and that he never undertook to do so, notwithstanding the information that he had about the condition of the valve during the entire six weeks prior to the explosion.

We find that the defendant was guilty of negligence which proximately contributed to the injury of plaintiff, and we also find that the plaintiff was guilty of negligence which proximately contributed to his own injury and that the finding of the Trial Court, to the extent of determining the plaintiff guilty of proximate contributory

negligence is correct, and that the learned Trial Judge pronounced proper judgment. Certainly the evidence in the case does not preponderate against his entered judgment.

The finding of the Trial Court contrary to the finding of this Court is not supported by the evidence to the extent that he found the defendant guilty of no negligence which proximately contributed to the injury. The result is that Assignments of Error I, V, the first part of VI, and Assignment VII are overruled and disallowed. Assignments of Error II, III and IV are sustained, but the learned Trial Court's error in this regard cannot overthrow the correct result reached by him, rendering judgment favorable to defendant.

Judgment will be entered in this Court sustaining final judgment of the Trial Court in favor of defendant, with costs against the plaintiff and the sureties on his appeal bond.

Carney and Bejach, JJ., concur.