GREAT AMERICAN INSURANCE COMPANY OF NEW YORK, A COR-PORATION, v. MODERN GAS COMPANY, INC., LUMBERTON, NORTH CAROLINA, A CORPORATION.

(Filed 10 January, 1958.)

**1. Insurance § 25b: Parties § 1—**

An insurance company which has paid the entire claim for damages to insured's home by fire and explosion is subrogated to the rights of insured and properly brings suit in its own name against the tortfeasor whose alleged negligence caused the damage.

**2. Gas § 1—**

Liquefied petroleum gas is a highly dangerous substance and the distributor of such gas is required to use that degree of care to prevent the escape of such gas from its tanks, pipes and containers which is

commensurate to the dangers to be reasonably anticipated by a prudent man, and is liable for the damages resulting from the negligent breach of this duty when the person suffering the injury is free from contributory negligence.

**3. Negligence § 9—**

While foreseeability is a requisite of proximate cause, it is not required that the injury in the precise form in which it occurred be foreseeable, but only that consequences of a generally injurious nature might have been reasonably foreseen.

**4. Gas § 2—**

Gas companies may be held liable for their negligence in filling the tanks of their customers in a manner so as to allow an escape of the dangerous substance, which proximately results in a fire or explosion causing damage to their customers, provided their customers are free from contributory negligence.

**5. Same—**

Evidence tending to show that while defendant's tank truck was delivering liquefied gas to a customer's storage tank, liquefied gas escaped from the hose connected to the tank right up against the house, where it vaporized and created an extremely hazardous situation, and that fire from a spark or from the pilot lights burning in the house or fire coming from the tank truck, ignited the gas causing an explosion and fire damaging the customer's property, *is held* sufficient to overrule nonsuit in an action against defendant for negligence.

**6., Same: Trial § 23f—**

In this action against a liquefied petroleum gas company to recover damages sustained when it permitted gas to escape while filling a customer's storage tank, resulting in explosion and fire, the fact that the allegations as to the source of the fire that ignited the gas fail to conform strictly to the proof *held* not to warrant nonsuit on the ground of variance upon consideration of all the facts and the further fact that there was neither allegation nor proof of any contributory negligence on the part of the customer.

APPEAL by plaintiff from a judgment of nonsuit entered at the close of its evidence by *Mallard, J.,* at March Term 1957 of ROBESON.

*Ellis E. Page for Plaintiff, Appellant.*

*Varser, McIntyre, Henry & Hedgpeth and Everett L. Henry for Defendant, Appellee.*

PARKER, J. Plaintiff's evidence tends to show the following facts:

On 2 May 1955, and prior thereto, Julius Bullard owned a one-story frame dwelling house, in which he and his wife lived, on Fairmont Road. In this home were household and kitchen furniture and other personal property.

The defendant is a North Carolina corporation, with its principal office in Lumberton, and is engaged in the sale, installation, and service of bottled gas and appliances.

On 5 October 1954 the defendant sold Julius Bullard a gas automatic water heater, and on the same day installed it, and a gas storage tank at his home. The gas storage tank was owned by Julius Bullard, but not acquired by him from defendant. In 1952 defendant sold, and installed in his home a gas space heater. The gas storage tank was a round, upright, above-ground tank, with a capacity of 125 gallons, and was situate at the rear of the house near an enclosed back porch at a place designated by Julius Bullard.

On the afternoon of 2 May 1955 defendant sent its tank truck to Julius Bullard's home for the purpose of putting liquefied petroleum gas in his storage tank. When the driver of defendant's tank truck arrived at Bullard's home, there was gas in his gas storage tank. The pilot lights were burning. No gas was escaping about Bullard's premises. Bullard's gas equipment had operated satisfactorily from the time it was installed, up until the time the driver of defendant's tank truck connected the hose from his gas tank wagon to Bullard's gas storage tank. Nothing was wrong with Bullard's gas equipment. Defendant's driver checked the gas storage tank, and found several gallons of gas in the storage tank. He also checked the tank, and saw the amount of pressure in it. Defendant's driver hitched the hose from the gas tank truck, screwed it to the gas storage tank, and started to put gas in the storage tank. The pump to pump gas from the truck into the storage tank is located in the foot of the truck. The pump is operated with a gear shift. The pump is put in gear, the truck motor does the pumping, and the gas comes out of the truck into the storage tank.

The defendant's driver began pumping gas into the storage tank, and after it had run a little while, the end of the tank started shooting a fog that went right up to the house. Julius Bullard's wife yelled, "shut that thing off." She went, and shut the back door. The pump was still pumping. It pumped a minute or so, and the driver had something in his hand, and hit the valve ten or twelve times.

Julius Bullard testified as follows:

"48 gallons of gas were pumped into my tank when the ticket was burned out of the machine. The computator was going pretty fast like counting 1, 2, 3, and on. You could tell by the way the computator was running. When the valve started releasing a vapor the driver of defendant's truck ran back around the truck and cut it off. The hose

caught on fire while the driver of the truck was helping me to learn to read the gauge. When the valve started releasing gas, he started beating the valve. He then went to the back there and cut it off after everything had went up. There was gas escaping from the hose connected to the tank and the fog and fire was blowing out of the end of that thing hot enough to melt the screen wire. I couldn't say there was any gas escaping around the connections. It was burning.

"The noise was like a big peal of thunder and then a great ball of fire shot out from the house. The fire was coming from the corner of the house when he was hitting the valve. There was no fire around where he was hitting that valve. The hose leading to the wagon caught on fire. After he went back and cut the pump off, I told him to back the truck out. I then put a ladder on top of the house, and the driver crawled up there and helped me fight the fire. . . . I know that the stuff that was coming out of the tank like fog was gas."

All the house was damaged. Every window sill "was busted." The doors didn't open as they did before, "but came out the opposite way." The walls on the inside of the house were torn all to pieces in every room. The fair market value of the house immediately prior to the explosion and fire was $8,500.00; immediately thereafter $1,000.00.

On cross-examination Julius Bullard testified:

"That explosion must have occurred inside the house. It blowed the doors open. There wasn't any explosion out there where I was, except that ball of fire that came out. I don't know if that came from the inside the house. The gas coming out of the valve made a bigger sound than a hissing sound. The gas was escaping from that tank. It came out of my safety valve. It was gas that had come out of the tank of Modern Gas Company, but the place the gas was escaping was from this safety valve that I brought here. I didn't strike any match out there and I didn't see any fire out there where me and the driver of the gas truck were. The fire that I was talking about that burned my house was inside and out. It happened on the inside of the house first and then came out. I don't know what caused the explosion inside of my house except the pilot lights went up. I was not in the house. I don't know what happened on the inside of my own knowledge."

On redirect examination he testified:

> "The first fire I saw was on the outside. The first fire was
> out there at the tank at the far end where the gas was
> coming out at the storage tank (my tank). That was the
> first fire I saw was outside. There was a ball of fire blow-
> ing out the other end."

The parties stipulated that plaintiff is a foreign corporation
doing an insurance business in North Carolina, and that it had
issued to Julius Bullard its Policy No. 31993, covering his
dwelling house and furniture. The evidence shows that plaintiff
paid Julius Bullard all his damages to his house and furniture
resulting from this explosion and fire. Upon receiving this
payment from plaintiff, Julius Bullard executed and delivered
to plaintiff a Loan Receipt transferring and assigning to it any
claim he has against the defendant for any negligence or other
fault in causing the damage to his house and furniture, and
authorizing plaintiff to prosecute suit against the defendant in
his, or its name, for such loss or damage.

An agent of plaintiff testified the policy covered fire, lightning,
or any event of that nature, and in accordance with the policy
plaintiff paid Julius Bullard all the damage he claimed in the
amount of $3,236.98, and that it is the holder of the Loan Re-
ceipt Julius Bullard assigned to it.

R. L. Spivey runs a furniture store. The next morning fol-
lowing the explosion and fire, he went to Julius Bullard's home,
and examined the furniture and contents therein. They were
burned and damaged, and had at that time a fair market value
of $75.00. He bought the gas storage tank, and saw on it the
pressure valve. His son is using this tank.

The insurance paid Julius Bullard by plaintiff under its policy
covered his loss in full. He testified: "The plaintiff in this
action paid me for all my damage." Therefore, the claim of
plaintiff, the insurer, represents the entire unsettled claim, and
it, being subrogated to the rights of the insured, properly
brought suit in its own name. *Insurance Co. v. Motor Lines,* 225
N.C. 588, 35 S.E. 2d 879; *Underwood v. Dooley,* 197 N.C. 100,
147 S.E. 686; *Insurance Co. v. Lumber Co.,* 186 N.C. 269, 119
S.E. 362; *Powell v. Water Co.,* 171 N.C. 290, 88 S.E. 426; *Cun-
ningham v. R. R.,* 139 N.C. 427, 51 S.E. 1029; *Insurance Co. v.
R. R.,* 132 N.C. 75, 43 S.E. 548. See *Burgess v. Trevathan,* 236
N.C. 157, 160, 72 S.E. 2d 231, 233; *Smith v. Pate,* 246 N.C. 63,
67, 97 S.E. 2d 457, 460.

"Although liquid gas was discovered by chemists in about
1910, it remained a waste product at the oil wells until the middle
1920's, when, apparently because a more economical and con-

venient method had been devised for the capture of the gas and its compression, the oil companies commenced to ship the new product in small containers to individual customers. Today, its use has expanded tremendously, and it is now widely employed in homes and business places where the location forbids the use of piped gas." Anno. 17 A.L.R. 2d 888-889. For a brief discussion of the history of liquid gases, see *Tennessee Gas Co. v. McCanless,* 184 Tenn. 387, 199 S.W. 2d 108.

*Graham v. Gas Co.,* 231 N.C. 680, 58 S.E. 2d 757, 17 A.L.R. 2d 881, quotes the following language from *Holmberg v. Jacobs,* 77 Or. 246, 150 P. 284, Ann. Cas. 1917 D, 496: It is a scientific fact "that gas ordinarily used for fuel is so inflammable that the moment a flame is applied it will immediately ignite with an instant explosion, if it is present in any considerable volume." Our opinion then states: "This being true, such gas is a dangerous substance when it is not under control."

The rule is well established that in view of the highly dangerous character of liquid gas and its tendency to escape, a gas company must use a degree of care to prevent the escape of such gas from its tanks, pipes and containers commensurate to the dangers to be reasonably anticipated by a prudent man, which it is its duty to avoid, and that if it fails to exercise this degree of care, and injury proximately results therefrom, the company is liable, provided the person suffering injury is free from contributory negligence. *Graham v. Gas Co., supra; Barbeau v. Buzzards Bay Gas Co.,* 308 Mass. 245, 31 N.E. 2d 522; *Skelly Oil Co. v. Holloway,* 171 F. 2d 670; *Clay v. Butane Gas Corp.,* 151 Neb. 876, 39 N.W. 2d 813; *March v. Carbide & Carbon Chemicals Corp.,* 265 App. Div. 1064, 39 N. Y. S. 2d 493; *Franklin v. Skelly Oil Co.,* 141 F. 2d 568, 153 A.L.R. 156; *Moran Junior College v. Standard Oil Co. of Cal.,* 184 Wash. 543, 52 P. 2d 342; *Barrickman v. Marion Oil Co.,* 45 W. Va. 634, 32 S.E. 327, 44 L.R.A. 92; 24 Am. Jur., Gas Companies, Sections 20, 21, 22 and 24; 38 C.J.S., Gas, Sections 41, 42 and 43.

In *Barbeau v. Buzzards Bay Gas Co., supra,* it is said: "The defendant in the conduct of its business (gasoline) was bound to use reasonable care to prevent the escape of gas upon the premises of the plaintiff; and that degree of care, in view of the dangerous character of gas and its tendency to escape, means care commensurate with the danger that would probably result if such care were lacking."

In *Small v. Utilities Co.,* 200 N.C. 719, 158 S.E. 385, there is an illuminating discussion of the degree of care required of a person dealing in or handling dangerous substances by Stacy, C.J., and in summing up the many quotations from the cases, he says: "The standard is always the rule of the prudent man, or

the care which a prudent man ought to use under like circumstances. What reasonable care is, of course, varies in different cases and in the presence of different conditions. *Fitzgerald v. R. R.*, 141 N.C. 530, 54 S.E. 391. The standard is due care, and due care means commensurate care under the circumstances."

In this jurisdiction foreseeable injury is a requisite of proximate cause. *Osborne v. Coal Co.*, 207 N.C. 545, 177 S.E. 796; *Aldridge v. Hasty*, 240 N.C. 353, 82 S.E. 2d 331. But the rule does not require that the negligent person should have been able to foresee, or anticipate, the injury in the precise form in which it occurred. *Riddle v. Artis*, 243 N.C. 668, 91 S.E. 2d 894. It is sufficient to satisfy the test of foreseeable consequences of negligence that in the exercise of reasonable care, the negligent person might have foreseen that consequences of a generally injurious nature might have been expected. *Hart v. Curry*, 238 N.C. 448, 78 S.E. 2d 170.

In accordance with the rule requiring distributors and sellers of bottled gas, or liquefied petroleum gas, to use care commensurate with the dangers to be reasonably anticipated by a prudent person, they have been held liable for their negligence in filling the tanks of their customers in a manner so as to allow an escape of the dangerous substance, which proximately results in a fire or explosion causing damage to their customers, provided their customers are free from contributory negligence. *Graham v. Gas Co., supra; Davidson v. American Liquid Gas Corp.*, 32 Cal. App. 2d 382, 89 P. 2d 1103; *Breed v. Philgas Co.*, 118 Conn. 128, 171 A. 14; *Manning v. St. Paul Gaslight Co.*, 129 Minn. 55, 151 N.W. 423, L.R.A. 1915 E, 1022, Ann. Cas. 1916 E, 276; 38 C.J.S. Gas, Section 42.

In *Clay v. Butane Gas Corp., supra,* where the defendant was held liable in damages to plaintiff for injury to his building and the personal property therein caused by an explosion of Butane gas due to defendant's negligence in filling the Butane tank under the circumstances on the day of the explosion, or in failing to discover the leak in the pipes, the Supreme Court of Nebraska said: "It being common knowledge that gas is a powerful and dangerous force that requires care on the part of those furnishing it, a gas company which knows of the location of the tank, pipes, and cutoffs in a customer's building is under the obligation and duty, in filling the tank, to exercise that degree of care, to protect the building and its occupants from injury, commensurate with the dangers incident to the use of such gas."

*Davidson v. American Liquid Gas Corp., supra,* was an action to recover damages to plaintiff's dwelling house and its contents resulting from defendant's negligence in permitting escape of

Butane gas being transferred from defendant's tank truck to storage tanks on plaintiff's premises. The gas was pumped by means of the motor from the truck through a rubber hose which was attached near the middle of the truck. The engine of the truck was left running during the entire filling process. During the process of filling the tanks a blast occurred. A witness, who was standing back of the truck, stated that the truck moved two or three feet and a flash hit him and burned his sweater, his right eye and the back of his neck. Plaintiff's house and its contents were totally destroyed by the fire. In affirming a recovery for plaintiff, the Court said: "By the process of elimination of all evidence of any possible negligence on the part of respondent or that the excess amount of escaping gas might have been ignited by any act of his, and in view of the fact that the escaping gas was ignited and the remaining evidence produced indicates that the only reasonable inference that could be drawn from the circumstances was that the back-fire from the exhaust ignited the excess escaping gas, we feel that the court was reasonably justified in finding that the damage was the result of appellants' negligence."

The allegations of negligence in the complaint are: One, the pump and equipment owned and used by the defendant in pumping gas from its tank truck into Julius Bullard's storage tank was defective, and was forcing the gas from the tank truck into the storage tank under too great a pressure and at too great a speed. Two, the defendant was negligent in making a faulty hose connection between its tank truck and the storage tank, and made the connection in such a manner as to allow large quantities of gas to escape. Three, the defendant's driver was negligent in that, when the gas safety exhaust valve began to release gas, he took a heavy metal object, and struck the safety exhaust valve several times, which caused the exhaust valve to release more gas. Four, after gas was escaping from the exhaust safety valve, defendant's driver continued to force a huge quantity of gas from its tank truck into the storage tank, until huge quantities of gas escaped, and vaporized in heavy clouds, and drifted into and penetrated Julius Bullard's home, where it exploded upon coming in contact with the pilot lights that were burning in the house. The complaint also alleges: "That the said gas was ignited from a spark as a result of the defendant's agent striking the metal exhaust valve with some heavy metal object, or was caused by the escaping gas seeping into the house where it came in contact with the burning pilot lights, or was caused as a result of both."

The precise kind of gas delivered by the defendant on this occasion is not shown. Plaintiff alleges in its complaint that the

defendant is engaged in the sale, installation and service of bottled gas, and defendant admits this in its answer. In its brief defendant states it "is engaged in the selling and distribution of liquid petroleum gas to its customers." The complaint alleges that the gas was Propane or Butane bottled gas.

The evidence discloses that defendant's driver had complete control of its tank truck, when it was putting liquefied gas in Julius Bullard's storage tank, that, while this operation was going on, the hose of the tank truck connected with the storage tank caught on fire, that gas was escaping from the hose connected to the tank, and fog and fire were blowing out of the end hot enough to melt the screen wire of the house. The gas was burning. Considering the evidence in the light most favorable to the plaintiff, it permits the legitimate inferences that defendant in making a delivery of the gas from its tank truck to Julius Bullard's storage tank was using insufficient or defective equipment, or making improper use of its equipment, and by reason thereof forced the liquefied petroleum gas into the open, and right up to his house, where it vaporized, and at once became extremely hazardous, that as a result of defendant's negligence in permitting this gas to escape into the open, and right up to his house, it became ignited from the fire on the hose of the tank truck, or from the burning pilot lights, or from some other fire coming from the tank truck, and that such negligence of the defendant in permitting the gas to escape was a proximate cause of the explosion and fire, which damaged Julius Bullard's home and its contents.

It is familiar learning that there must be, under the old or new system of pleading, *allegata* and *probata,* and the two must correspond with each other. *Sale v. Highway Com.,* 238 N.C. 599, 78 S.E. 2d 724; *Whichard v. Lipe,* 221 N.C. 53, 19 S.E. 2d 14.

Accepting plaintiff's evidence as true, which we are required to do in consideration of a motion for judgment of nonsuit, it tends to show that the defendant's negligence in permitting the liquefied gas to escape into the open, and right up to Julius Bullard's house, where it vaporized, created an extremely hazardous situation, which set the stage for an explosion, if fire, or a spark of fire, came in contact with it. While plaintiff's allegations of the source of the fire that ignited the gas causing the explosion probably do not strictly conform with the proof as to its source, yet considering all the facts, and the further fact that there is neither allegation, nor proof, of any contributory negligence on the part of Julius Bullard, the proof does not sufficiently depart from the allegations of the complaint to require a compulsory nonsuit on the ground of a fatal variance between allegation and proof.

Plaintiff is entitled to have a jury to pass upon the evidence, and the judgment of compulsory nonsuit below is
Reversed.