BLUEFLAME GAS, INC., Petitioner,
v.

James Willard VAN HOOSE and Louisa
Van Hoose, Respondents,

PHILLIPS PETROLEUM COMPANY,
Petitioner,

v.

James Willard VAN HOOSE and Louisa
Van Hoose, Respondents,

DIAMOND SHAMROCK
CORPORATION,
Petitioner,

v.

James Willard VAN HOOSE and Louisa
Van Hoose, Respondents.

Nos. 82SC52, 82SC56 and 82SC57.

Supreme Court of Colorado,
En Banc.

March 12, 1984.

As Modified on Denial of Rehearing
April 2, 1984.

Petersen & Fonda, P.C., Lawrence J. Simons, Pueblo, for petitioner Blueflame Gas, Inc.

Williams, Trine, Greenstein & Griffith, P.C., William A. Trine, Boulder, Faricy, Tursi & Phelps, James V. Phelps, Dale P. Tursi, Pueblo, for respondents.

Donald E. La Mora, Colorado Springs, for petitioner Diamond Shamrock Corp.

Louis J. Stuart, P.C., Louis J. Stuart, Pueblo, for petitioner Phillips Petroleum Co.

QUINN, Justice.

We granted and consolidated these three separate petitions for certiorari, filed by the petitioner-defendants, to review the court of appeals' decision in *Van Hoose v. Blueflame Gas, Inc.,* 642 P.2d 36 (Colo. App.1981). The respondent-plaintiffs, James and Louisa Van Hoose, had sued the petitioner-defendants, Phillips Oil Company (Phillips), Diamond Shamrock Corporation (Diamond Shamrock), and Blueflame Gas, Inc. (Blueflame), for damages resulting from a propane gas explosion in their home. The court of appeals reversed a judgment for the defendants and ordered a new trial because, in its view, the trial court erroneously instructed the jury on the standard of care applicable to suppliers of propane gas and also on the plaintiffs' burden of proof in a strict liability claim involving an allegedly defective product. We affirm the judgment of the court of appeals.

## I.

James and Louisa Van Hoose filed suit against Phillips, Diamond Shamrock, and Blueflame for damages as the result of injuries sustained by James in a gas explosion at their home in Pueblo County, Colorado, on July 23, 1972.[1] The complaint included separate claims in negligence and strict liability in tort. The claim in negligence alleged that the defendants failed to properly odorize the propane gas with ethyl mercaptan, as required by an administrative regulation promulgated by the State Inspector of Oils, failed to test for appropriate odorization prior to the sale of the

propane to the Van Hooses, and failed to warn them of the inadequate odorization. A separate claim in strict liability, based on § 402A, *Restatement (Second) of Torts* (1965), alleged that the failure to sufficiently odorize the propane gas rendered it a defective product unreasonably dangerous to consumers and users.[2] The defendants denied liability and raised the affirmative defense of contributory negligence on the negligence claim. A two week jury trial, commencing on June 8, 1977, resulted in verdicts for the defendants.

In 1972 Phillips and Diamond Shamrock jointly owned a storage terminal located in La Junta, Colorado. The terminal, which was operated solely by Phillips, was used for the storage and sale of propane and other petroleum products. Propane was piped to the La Junta terminal through a line that originated at the Phillips refinery at Borger, Texas, and was joined by a branch line from Diamond Shamrock's refinery in McGee, Texas. The propane was then stored at the La Junta terminal until sold to customers of either Phillips or Diamond Shamrock.

Propane is a liquefied petroleum gas compressed at a low temperature and used as a domestic fuel. When released by means of a regulator through a small vent, propane vaporizes into an inflammable gas that flows through pipes to stoves and other domestic appliances. Propane is odorless, highly combustible, and, like other gases, has a natural tendency to escape when under pressure. Because of these characteristics the State Inspector of Oils, many years prior to the events in question,

1. The claims of Louisa Van Hoose were for loss of consortium based on the injuries and disabilities sustained by her husband from the gas explosion. There is no reason to differentiate in this opinion the consortium aspects of Mrs. Van Hoose's claims from those of her husband, and we therefore refer to their claims collectively.

2. Prior to and during trial the plaintiffs moved to amend their strict liability claim to include, in addition to the allegation that the propane sold to them was in a defective condition and unreasonably dangerous, an allegation that the defendants' failure to warn purchasers of the possibility of the propane odorant dissipating

rendered the propane a defective and unreasonably dangerous product. The trial court denied the motion to amend. In reversing the judgment and ordering a new trial, the court of appeals held that the trial court should permit the amendment prior to retrial of the case. This aspect of the court of appeals' decision has not been challenged by the defendants in their petition for certiorari, and we do not address it further. *See, e.g., Anderson v. Heron Engineering Co., Inc.,* 198 Colo. 391, 604 P.2d 674 (1979); *Hiigel v. General Motors Corp.,* 190 Colo. 57, 544 P.2d 983 (1975).

promulgated Regulation B.1. This regulation requires the addition of an odorization agent sufficient to indicate the presence of gas in concentrations of at least one-fifth of the lower limit of flammability.[3] In the case of propane, the lower limit of flammability is the volumetric percentage of 2.15 percent propane in a gas-air mixture. Regulation B.1 states that the requirement "shall be considered to be met by the use of 1.0 pounds of ethyl mercaptan ... per 10,000 gallons of L.P.-gas." [4]

Ethyl mercaptan is a clear liquid and has a strong stench commonly described as "the smell of gas." The purpose of this additive is to give propane a sufficient odor so that its presence will be detected in the event it accidentally escapes. Ethyl mercaptan has a tendency to oxidize and breaks down chemically under various conditions with a resulting loss in odorization. When confined in metal containers, ethyl mercaptan is subject to some absorption into the metal surface, especially when the container is new, with a decrease in odorizing effect. Because the odor of ethyl mercaptan may be masked with other strong odors, such as that emanating from mildew, any loss of odorization increases the potential for masking.

It was the customary practice of the Phillips employees to add ethyl mercaptan to the propane at the La Junta terminal. The ethyl mercaptan was shipped from the Borger refinery in Texas and placed in storage tanks at the La Junta terminal, where it remained without modification or testing until it was added to the propane. The odorization process took place when the propane was loaded into tanker trucks for delivery to retailers. At the start of each load an injection pump added ethyl mercaptan to the tanker truck to permit it to mix with the propane during the loading process. The ethyl mercaptan was measured through the use of a "sight glass," which was a glass tube approximately twelve inches in length with a graduated scale on the side indicating the amount of propane in increments from 1,000 to 8,000 gallons. When the ethyl mercaptan was injected into the tank of the truck, a small teflon float inside the "sight glass" would rise to the equivalent level of propane gallons. Addition of ethyl mercaptan in accordance with the sight glass calibrations resulted in a ratio of 1.5 pounds of odorant per 10,000 gallons, one-half again the amount required by Regulation B.1. After the ethyl mercaptan had been added, a Phillips employee then pumped the propane into the tank of the delivery truck. When the loading process was completed, there was no further testing to determine the efficacy of the odorization process, although several tests were available for this purpose.[5]

---

3. Section 8–20–402, C.R.S.1973 (formerly C.R.S. 1963, 100–5–2), grants the State Inspector of Oils authority to promulgate regulations specifying the odorization of liquid petroleum gases, the degree of odorization, and the odorizing agent to be used.

4. Regulation B.1 states:
   "B.1 Odorizing Gases.
   "(a) All liquefied petroleum gases shall be effectively odorized by an approved agent of such character as to indicate positively, by distinct odor, the presence of gas down to concentration in air of not over one-fifth the lower limit of flammability. Odorization, however, is not required if harmful in the use or further processing of the liquefied petroleum gas, or if odorization will serve no useful purpose as a warning agent in such use or further processing.
   "Note: the lower flammable limits of the more commonly used LP-Gases are: Propane, 2.15 percent; Butane, 1.55 percent. These figures represent volumetric percentages of gas in gas-air mixtures.
   "(b) The odorization requirement of B.1(a) shall be considered to be met by the use of 1.0 pounds of ethyl mercaptan, 1.0 pounds of thiophane or 1.4 pounds of amyl mercaptan per 10,000 gallons of LP-Gas. However, this listing of odorants and quantities shall not exclude the use of other odorants that meet the odorization requirements of B.1 (a)...."

5. Robert Harrison, an engineer, described a number of field tests available in 1972 for the testing of ethyl mercaptan. The simplest and most reliable was the "odorometer," a compact portable instrument calibrated to detect percentages of gas in the air and thus to determine whether the ethyl mercaptan was detectable at the requisite one-fifth of the lower flammable limit. Mr. Harrison described two other field tests as follows:

Blueflame was a commercial customer of Diamond Shamrock and purchased propane from the La Junta terminal. Blueflame had a 30,000 gallon propane tank on its lot in Pueblo. Propane was shipped by tanker truck from the La Junta terminal and pumped directly into Blueflame's tank without further modification or testing. From Blueflame's tank the propane would then be transported to residential customers.

Two sales of propane were made by Diamond Shamrock to Blueflame in April and May of 1972. On April 24, 8,874 gallons were sold to Blueflame and again on May 5, 8,900 gallons were sold. Truck loading receipts for these sales indicated that Carl Gearhart, the Phillips operator at the La Junta terminal, had added ethyl mercaptan to these loads in the ratio of 1.5 pounds per 10,000 gallons of propane, although Gearhart had no specific recollection of the two loads in question.

On May 5, 1972, the same day that 8,900 gallons of Diamond Shamrock's propane had been delivered to Blueflame's storage tank in Pueblo, a Blueflame employee, Rudy Stanley, made a residential delivery of approximately 200 gallons of propane to the plaintiffs' home. The propane, which was used by the Van Hooses to fuel their cooking and heating stoves and a hot water heater, was pumped into a tank located outside the house. The tank had a capacity of 375 gallons and was connected by an underground copper gas line to the stoves and hot water heater. The 200 gallon delivery, according to Stanley, resulted in filling the tank to sixty percent of its capacity. No further deliveries were made by Blueflame to the plaintiffs between this date

and the date of the explosion on July 23, 1972. Although Stanley could not recall if he had smelled an odor in the propane delivered to the plaintiffs, he testified that the degree of odorization often varied during the one and one-half years he had worked for Blueflame and, in fact, on two occasions he delivered propane with no odor at all.

In July of 1972 the Van Hooses and their seven children left for a two-week vacation. While they were gone James Van Hoose's brother, Billy, looked after the house and the livestock, making trips twice daily to the house for this purpose. Because the Van Hooses had no easily accessible water tap outside the house, Billy went into the house on each occasion to get water for the livestock. During this period of time he never noticed any odor of propane in the house.

On July 22, 1972, the Van Hooses returned home from vacation. After supper James wanted to take a bath, but discovered that there was no hot water. Feeling too tired to check the hot water heater in the basement, he went to bed. Although he and his wife were familiar with the smell of gas, neither of them detected any odor of gas in the home.[6] Nor did James' brother Billy or Billy's wife, both of whom were present in the home at this time, smell any gas.

On the next morning James went down to the basement to check the hot water heater and discovered that the pilot light was out. He detected no smell of gas at this time. As he lit a match to ignite the pilot, there was an explosion and a flash fire broke out.[7] James, who had caught on

"The Austin Titrator Field Test and the [T]itrolog are both compact, portable instruments that can be taken to the field that have the imperative absorption material in there in which you bubble the gas through and it allows the simple means of titrating this to determine in the field the percentage of ethyl mercaptan available."

6. There was additional evidence on the lack of any gaseous odor in the Van Hoose's home prior to the explosion. On the afternoon of July 22, 1972, prior to the return of the Van Hooses

from vacation, Billy Van Hoose and his wife, Dottie Jean, went to the Van Hoose home to air it out and to prepare it for the return of the Van Hoose family. Neither Billy nor Dottie Jean Van Hoose noticed any odor of gas at this time.

7. The hot water heater was designed to function by means of three controls located in close proximity to each other on the face of the appliance. The main control valve controlled the flow of gas to the system. When turned to the "off" position, the valve shut and no gas flowed to the heater. If the valve was turned to the

fire, crawled out of the basement and rolled around until he extinguished the flames. He sustained third degree burns to fifty percent of his body and suffered serious injuries to his hands, arms and neck. While driving him to the hospital his wife asked him why he had tried to light the hot water heater if he smelled gas, to which he replied there was no odor of gas.

On the morning following the explosion Louisa Van Hoose called Blueflame to report the incident. Blueflame's employee, Rudy Stanley, went to the Van Hoose residence and checked the hot water heater and the propane system for leaks. He found no leaks and, at Mrs. Van Hoose's request, disconnected the hot water heater. Stanley then returned to Blueflame and told his supervisor, Lloyd O'Donnell, that while he was disconnecting the hot water heater he had been unable to smell the propane that came through the lines. O'Donnell, according to Stanley, told him to go back to the Van Hoose residence and put several gallons of new propane in the tank to odorize the existing propane. Later that day Stanley returned to the Van Hoose home and put fifteen to twenty gallons of odorized propane in the tank.

Robert Harrison, a consulting engineer specializing in fires and explosions, visited the Van Hoose residence during February and March of 1973 to conduct an investigation into the explosion. He tested the gas lines leading into the basement and found no leaks. The hot water heater functioned properly, despite the fact that the knob for the main gas control was missing. Mr. Harrison acknowledged, however, that automatic shut off valves sometimes will malfunction when the pilot light goes out and thereafter function properly.[8] The Van Hoose basement, according to Mr. Harrison, showed typical evidence of a flash fire of short duration, including small bits of charring of floor joists and charred paper, cardboard and cloth. It was his opinion that the fire had been caused by an accumulation of vaporized liquid petroleum gas within the basement.

At the conclusion of the evidence the plaintiffs tendered an instruction that, in addition to noting that "[t]he degree of care must be equal to the degree of danger involved," stated that "one who has in his

---

"on" position, gas flowed to the pilot and the main burner. When the valve was turned to "pilot," the gas flowed to the pilot only. The pilot, once lit, burned continuously with a small jet of flame designed to ignite the main burner. The pilot flame heated a thermocouple which operated as an electromagnet to maintain the gas valve in an "on" position when the pilot was burning. When the gas pilot was extinguished, the gas valve was designed to close and to shut off the flow of gas. The second control feature of the hot water heater was a small "minute" button which had to be depressed briefly before lighting the pilot in order to start the gas flowing through the system. The third control valve was the temperature control knob, which regulated the temperature of the water in the heater.

A decal affixed to the side of the hot water heater described the proper procedures for lighting the unit. The main control valve was to be on the "off" position for a short period of time before turning the control valve to the "pilot" position. Then, while depressing the minute button to start the gas flow, the pilot burner was to be lit. The minute button was to be held down for one minute during which the pilot should continue to burn. The control knob was then to be turned to the "on" position, allowing the pilot to ignite the main burner.

James Van Hoose's testimony was somewhat inconsistent with regard to the procedure he followed in attempting to light the hot water heater. Although he ultimately concluded that he must have turned the main control knob to "off" before setting it to "pilot," there was some question as to whether he had actually done so. At one point in his testimony he indicated that the temperature control knob, rather than the main control knob, was the knob he turned to "pilot." Later, he indicated that it was the main control valve that he turned on. Also, he testified at one point that he depressed the minute button for 25 to 30 seconds, and later stated that he never had an opportunity to depress it.

8. His testimony in this respect was as follows:

"Well, I have experienced a number of times failures of these controls primarily due to grime and dirt and grease sticking it in an on position after it's set for a period of time and many times such a failure will be a one time thing. Once it's jarred loose after having been stuck in the on position it will then subsequently work and work properly but I have experienced definite failures in the past on some of the units."

possession, or under his control, an exceptionally dangerous instrumentality is bound to take exceptional precautions to prevent an injury being done by the instrumentality." The trial court refused this instruction and, after defining negligence as the failure to use reasonable care, gave Instruction No. 12 which stated that "[r]easonable care is that degree of care which a reasonably prudent person would use under the same or similar circumstances." Plaintiffs' counsel objected to Instruction No. 12 on the ground that his tendered instruction set forth the appropriate standard of care applicable to the negligence claim.

The court also gave Instruction No. 19A on the burden of proof applicable to the plaintiffs' strict liability claim. Instruction No. 19A stated as follows: "You are instructed that a seller is not liable when he delivers the product in a safe condition and the burden of proof is on the plaintiffs to establish the product was in a defective condition at the time when it left the hands of the particular seller." Plaintiffs' counsel objected to this instruction as beyond the purview of the pleadings.

The jury returned verdicts in favor of the defendants on all claims. The plaintiffs thereafter appealed to the court of appeals which reversed the judgment and ordered a new trial. With regard to the negligence claim the court of appeals held that the plaintiffs, having properly objected to the instruction (Instruction No. 12) given by the court on the standard of care, were entitled to an instruction on an enhanced standard of care applicable to suppliers of propane gas. In addition, the court of appeals, relying on this court's decision in *Prutch v. Ford Motor Co.*, 618 P.2d 657 (Colo.1980), held that Instruction No. 19A imposed an erroneous burden of proof on the plaintiffs by requiring them to establish that the propane was in a defective condition at the time it left the hands of a particular seller. We granted the defendants' petitions for certiorari to consider three questions: whether propane is a sufficiently dangerous substance as to require an enhanced standard of care of those distributing and selling that substance to consumers; whether, in connection with a strict liability claim based on § 402A of the *Restatement (Second) of Torts*, a plaintiff has the burden of proving the product was in a defective condition at the time it left the possession of a particular seller; and last, an issue not addressed by the court of appeals, whether a propane supplier's compliance with an administrative safety standard conclusively establishes that the supplier was not negligent in the distribution or sale of propane and that the propane was not a defective product.

## II.

Before we examine the trial court's instructions on the standard of care applicable to a propane supplier and on the plaintiffs' burden of proof on their strict liability claim under § 402A of the *Restatement (Second) of Torts*, we must consider as a threshold matter whether the plaintiffs' objections to the challenged instructions were adequate to preserve the issue of their correctness for appellate review. The defendants claim that appellate review of the propriety of these instructions was foreclosed by reason of the general nature of the objections. In our view the plaintiffs' objection to the instruction on the standard of care applicable to a propane supplier (Instruction No. 12) was adequate to preserve this issue for appellate review. Although the plaintiffs' objection to the instruction on the burden of proof on their strict liability claim (Instruction No. 19A) was not sufficiently specific to comport with C.R.C.P. 51, we nonetheless elect to address the correctness of this instruction under a plain error standard.

C.R.C.P. 51 states, in pertinent part, that "[a]ll instructions shall be submitted to the parties, who shall make all objections thereto before they are given to the jury," and that "[o]nly the grounds so specified shall be considered on motion for a new trial or on appeal or certiorari." The purpose of this requirement is to "enable trial judges to clarify or correct misleading or

erroneous instructions before they are given to the jury, and thereby prevent costs of retrials necessitated by obvious and prejudicial error." *Scheer v. Cromwell*, 158 Colo. 427, 429, 407 P.2d 344, 345 (1965). A general objection that states no ground of error is the equivalent of no objection at all because it deprives the trial court of any meaningful opportunity to correct its own error. *See, e.g., Ross v. Colorado National Bank*, 170 Colo. 436, 463 P.2d 882 (1969); *Jones v. Jefferson County School District No. R–1*, 154 Colo. 590, 392 P.2d 165 (1964); *Spears Free Clinic v. Maier*, 128 Colo. 263, 261 P.2d 489 (1953). Where, however, the objection sufficiently directs the court's attention to the asserted error, the purpose of C.R.C.P. 51 has been satisfied. *See Lewis v. La Nier*, 84 Colo. 376, 270 P. 656 (1928).

In objecting to Instruction No. 12, which delineated the standard of care applicable to the plaintiffs' negligence claim, plaintiffs' counsel stated that the correct standard of care had been set out in his tendered instruction on this point of controversy. The tendered instruction referred to by plaintiffs' counsel stated basically that the degree of care must be commensurate with the danger and that one in possession of "an exceptionally dangerous instrumentality" must take "exceptional precautions" to prevent injury to others. The objection to Instruction No. 12 was sufficient to direct the court's attention to the legal question relating to the standard of care and provided the court with an opportunity to correct any error in the challenged instruction.

Instruction No. 19A, which was given in connection with the plaintiffs' burden of proof on their strict liability claim, was challenged by plaintiffs' counsel on the ground that it was not within the purview of the pleadings. This objection was too general in character to satisfy the requirements of C.R.C.P. 51. On prior occasions, however, notwithstanding the lack of a proper objection, we have elected to address the correctness of an instruction on our own motion in order to prevent a manifest injustice to a litigant and to assure an appellate resolution of a controversy in accordance with correct principles of law. *E.g., Kendall v. Hargrave*, 142 Colo. 120, 349 P.2d 993 (1960); *Warner v. Barnard*, 134 Colo. 337, 304 P.2d 898 (1956); *Carr v. Boyd*, 123 Colo. 350, 229 P.2d 659 (1951). We elect to follow that course here. Irrespective of the nonspecific nature of the objection to the instruction, Instruction No. 19A implicated a critical aspect of the plaintiffs' strict liability claim and, as such, affected the substantial rights of the parties. C.A.R. 35(e). We turn therefore to a consideration of each instruction.

### III.

The trial court, in Instruction No. 12, defined the standard of care applicable to the plaintiffs' negligence claim as "that degree of care which a reasonably prudent person would use under the same or similar circumstances." The court of appeals, in reversing the judgment and ordering a new trial, held that the trial court erred in giving Instruction No. 12. We agree with the court of appeals that the trial court erred in instructing on reasonable care, rather than a higher degree of care, in connection with the plaintiffs' negligence claim.[9]

It is axiomatic in the law of negligence that the greater the risk, the greater the amount of care required to avoid injury to others. 1 J. Dooley, *Modern Tort Law* § 3.14 at 40 (Lindahl rev. 1982); W. Prosser, *Law of Torts* § 34 at 180 (4th ed.

---

9. In its opinion the court of appeals stated that, because the plaintiffs' tendered instruction on "exceptional precautions" by one in possession of an "exceptionally dangerous instrumentality" was a proper alternative instruction to the reasonable care instruction, the plaintiffs' tendered instruction should have been given. Although the plaintiffs' objection to Instruction No. 12 on reasonable care and the plaintiffs' tendered instruction on "exceptional precautions" adequately served to put the trial court on notice of the need for an instruction casting the defendants' duty in terms of a higher degree of care than "reasonable care," we do not view the plaintiffs' tendered instruction as a clear-cut expression of the highest degree of care applicable to this case, and, for this reason, it should not be given on retrial.

1971). Thus, greater care may be required of one who dispenses a product in the stream of commerce when the product itself, by virtue of its inherent character, poses a high risk of injury to others. *See, e.g., Grange Mutual Fire Insurance Co. v. Golden Gas Co.,* 133 Colo. 537, 298 P.2d 950 (1956); *Hall v. Dexter Gas Co.,* 277 Ala. 360, 170 So.2d 796 (1964); *Doxstater v. Northwest Cities Gas Co.,* 65 Idaho 814, 154 P.2d 498 (1944); *Great American Insurance Co. v. Modern Gas Co.,* 247 N.C. 471, 101 S.E.2d 389 (1958).

Electricity is one example of an instrumentality requiring an enhanced degree of care by those supplying it to others for domestic and commercial use. In *Denver Consolidated Electric Co. v. Simpson,* 21 Colo. 371, 376–77, 41 P. 499, 501 (1895), the court held that an electric utility company must be held to the "highest degree of care which skill and foresight can attain consistent with the practical conduct of its business under the known methods and the present state of the particular art." *Accord Federal Insurance Co. v. Public Service Co.,* 194 Colo. 107, 570 P.2d 239 (1977); [10] *Blankette v. Public Service Co.,* 90 Colo. 456, 10 P.2d 327 (1932). There are other substances that, due to the gravity of the risk created by them, require an enhanced measure of care on the part of distributors. *See, e.g., Ambriz v. Petrolane, Ltd.,* 49 Cal.2d 470, 319 P.2d 1 (1957) (high degree of care required of those handling butane gas); *Crane v. Adams,* 226 Miss. 436, 84 So.2d 530 (1956) (gasoline is a "dangerous agency" requiring highest degree of care); *Hammond v. Nebraska Natural Gas Co.,* 204 Neb. 80, 281 N.W.2d 520 (1979) (distributor of natural gas, a dangerous commodity, was required to exercise a high degree of care to prevent injury to public from escaped gas); *Herman v. Midland Ag Service,* 200 Neb. 356, 264 N.W.2d 161 (1978) (explosive potential of anhydrous

ammonia fertilizer calls for highest degree of care by supplier). Applying the maxim that a dangerous substance requires a degree of care commensurate with the gravity of the risk, other courts have required suppliers of propane to exercise an enhanced degree of care to prevent injury to others from its escape. *Parkinson v. California Co.,* 255 F.2d 265 (10th Cir.1958); *Darnell v. Panhandle Cooperative Association,* 175 Neb. 40, 120 N.W.2d 278 (1963).

■ Although this court has made no express statement on the amount of care required of propane suppliers, we have recognized that it is a "dangerous substance" to be "handled with the care and caution commensurate with its dangerous character." *Grange Mutual Fire Insurance Co. v. Golden Gas Co.,* 133 Colo. at 543, 298 P.2d at 953; *accord Ward v. Aero-Spray, Inc.,* 170 Colo. 26, 458 P.2d 744 (1969). In view of the gravity of the risk posed by vaporized propane, the presence of which is undetectable without the addition of an appropriate odorizer, those involved in its distribution should take special precautions to provide warning to persons that escaping gas is in their midst. We therefore hold that suppliers of propane must exercise the highest degree of care, consistent with the practical conduct of their business under the present state of the art, in making certain that the propane is sufficiently odorized so that those persons who use this substance as a source of energy for heaters, stoves and other appliances will be alerted to the presence of escaping gas.

The trial court erred in defining the defendants' duty as one of reasonable care only. Instead, the court should have informed the jury by appropriate instruction that, because of its dangerous character, the defendants were obliged to exercise the highest degree of care with respect to the odorization of the propane sold to the plaintiffs. An instruction formulated in terms

**10.** In *Federal Insurance,* the court observed that compelling reasons continue to exist to warrant the highest degree of care on the part of electrical utility companies because: "(1) electrical energy possesses inherently dangerous properties, (2) electric utilities possess expertise in

dealing with electrical phenomena and in operating facilities for delivery of electricity, and (3) the general public is not able to recognize and guard against the dangerous potential of certain situations." 194 Colo. at 112, 570 P.2d at 242.

of the highest degree of care is nothing more than a plain statement to the jury that the inordinate risk posed by escaping propane requires an amount of care commensurate with that risk.

## IV.

We turn now to Instruction No. 19A, which imposed on the plaintiffs the burden of establishing that the propane was in a defective condition and unreasonably dangerous at the time it left the hands of the particular seller. This instruction adversely affected the substantial rights of the plaintiffs by imposing on them an erroneous burden of proof on their strict liability claim.

In *Hiigel v. General Motors Corp.*, 190 Colo. 57, 544 P.2d 983 (1976), this court adopted the doctrine of strict liability in tort for selling a product in a defective condition unreasonably dangerous to the user or consumer. This doctrine, originating in § 402A of the *Restatement (Second) of Torts* (1965), applies to manufacturers, wholesalers, and retail distributors. *Hiigel v. General Motors Corp., supra; Pust v. Union Supply*, 38 Colo. App. 435, 561 P.2d 355 (1976), *aff'd*, 196 Colo. 162, 583 P.2d 276 (1978). The crux of a strict liability claim is the product itself. Liability depends on the defective character of the product and not on the fault or culpability of a defendant in introducing the product into the stream of commerce. *E.g., Jackson v. Harsco Corp.*, 673 P.2d 363 (Colo.1983); *Hiigel v. General Motors Corp., supra; Kinard v. Coats Co., Inc.*, 37 Colo.App. 555, 553 P.2d 835 (1976). In this respect a strict liability claim under § 402A is not dissimilar to a claim for breach of warranty under the Uniform Commercial Code. *See Westric Battery Co. v. Standard Electric Co., Inc.*, 482 F.2d 1307 (10th Cir.1973).

In *Prutch v. Ford Motor Co.*, 618 P.2d 657 (Colo.1980), we considered the nature of a plaintiff's burden of proof in an action for breach of express and implied warranties under the Uniform Commercial Code arising out of the purchase of allegedly defective farm implements. The court of appeals had imposed on the plaintiff-purchasers the burden of proving that the equipment was defective at the time it left the defendant-manufacturer's control. We viewed this burden as reflective of unrealistic expectations, especially when applied to a transaction between a typical consumer and a franchise dealer or manufacturer. In reversing the court of appeals we stated:

"Unlike conditions in less complex times, today's typical consumer has no means of discovering whether the product of a remote manufacturer was defective when it left the factory, or at what point in the multi-step manufacturing-delivery process the defect was introduced. At best the ordinary buyer is able to become aware only after delivery to the buyer that the product is defective. [Citations omitted].

"To impose an impossible or unreasonably onerous burden of proof is to deny many consumers a meaningful remedy. Thus, a plaintiff's burden should be no more than to establish that the defect arose in the course of [manufacture]-distribution and before the plaintiff purchased the item. A plaintiff who claims breach of warranty, therefore, should be able to satisfy the burden of proof by evidence that at the time of purchase or acquisition the product was flawed in a manner constituting a breach of warranty, and damages resulted. *See* 2 Frumer and Friedman, *Products Liability*, § 16A(4)(e)(iii) at 117.

"Manufacturers, distributors, and sellers in the chain usually have greater access to information identifying a defect's source than does the buyer. Moreover, they are in a position to protect themselves against losses from conduct of another in the chain, as by 'hold harmless' and indemnity agreements or other contractual arrangements.

"Injustice would result from denying a claim for relief for breach of warranty when one of several defendants clearly was responsible for the defect giving rise to the breach, but the plaintiff cannot

prove which one. Procedural rules governing burden of proof and burden of going forward with the evidence are intended to facilitate the truth-seeking process of trial, and thus to facilitate justice. Requiring each defendant in the chain of distribution to show that the product was not defective when it left its control imposes no unreasonable burden on defendants. Such a procedure simply redistributes the burden to those who have superior knowledge of the truth and better access to evidence." 618 P.2d at 660.

We can conceive of no reason to apply a different rule in the instant case. Beyond the fact that *Prutch* involved a breach of warranty claim under the Uniform Commercial Code, whereas this case is based on the doctrine of strict liability in tort for a defective product, all considerations governing the appropriate burden of proof are identical. Requiring a strict liability plaintiff to prove that a defect existed when the product left the hands of a particular distributor would impose an extremely onerous burden of proof on the party least likely to have access to information about the character and condition of the product at that time. The injustice of such a rule is especially glaring in the case of a product sold in bulk that requires no processing or change by the consumer prior to its use. As one court has cogently observed:

"There would be little gain to the consuming public if the courts would establish a form of recovery with one hand and take it away with the other by establishing impossible standards of proof. The proof required in a strict liability case must be realistically tailored to the circumstances which cause the form of action to be created." *Lindsay v. McDonnell Douglas Aircraft Corp.*, 460 F.2d 631, 639 (8th Cir.1972).

We thus agree with the court of appeals that the trial court erred. in instructing the jury that the plaintiffs were required to prove the defective character of the propane as of the time it left the hands of a particular seller. The plaintiffs' burden on the issue of defect should have been limited to proof that the defect which rendered the product unreasonably dangerous to the user or consumer occurred in the course of the distribution process and before the plaintiffs purchased the product. In the case of a product sold in bulk, such as propane, this burden is satisfied by evidence showing that the product was defective and unreasonably dangerous when purchased or when put to use within a reasonable time after purchase.

## V.

The final issue we address is whether, as the defendants urge, a propane supplier's compliance with a state safety standard conclusively establishes that the supplier was not negligent and that the propane was not defective at the time of sale to the consumer. The defendant's contention in this respect is really a claim that, pursuant to C.R.C.P. 50, they were entitled to a directed verdict or to a judgment notwithstanding the verdict on the issue of liability. We disagree with their argument.

Regulation B.1 was issued by the State Inspector of Oils pursuant to his statutory authority to promulgate regulations "specifying the odorization of [liquefied petroleum] gases and the degree thereof and the odorizing agent to be used therein." Section 8–20–402, C.R.S.1973 (formerly C.R.S. 1963, 100–5–2). The regulation stated that the odorization requirement "shall be considered to be met by the use of 1.0 pounds of ethyl mercaptan ... per 10,000 gallons of LP-Gas." Violation of any of the regulations of the State Inspector of Oils promulgated pursuant to his statutory authority is a misdemeanor punishable by a fine of not more than $500. Section 8–20–403, C.R.S.1973 (formerly C.R.S.1963, 100–5–3). While undoubtedly violation of the odorization regulation would subject a supplier of propane to criminal liability, it does not necessarily follow that compliance should serve to immunize the supplier from civil liability for injuries resulting from a propane explosion. The effect of a supplier's compliance with the odorization requirement on civil claims in negligence and strict

liability must be analyzed within the framework of the liability principles underlying those claims.

### A.

■ As we have held in Part III, *supra,* due to the dangerous character of propane, suppliers of this substance must exercise the highest degree of care, consistent with the practical conduct of their business under the present state of the art, to assure that it is sufficiently odorized to protect persons from the grave risk of injury caused by escaping gas. In addressing the effect of compliance with an administrative safety standard on a negligence claim, courts in other jurisdictions have recognized that compliance is merely a circumstance to be weighed with other factors and, by itself, is not necessarily conclusive. on the issue of due care or negligence. *E.g., Hageman v. Signal L.P. Gas, Inc.,* 486 F.2d 479 (6th Cir.1973); *Stevens v. Parke, Davis & Co.,* 9 Cal.3d 51, 107 Cal. Rptr. 45, 507 P.2d 653 (1973); *Potter v. Battle Creek Gas Co.,* 29 Mich.App. 71, 185 N.W.2d 37 (1970); *Blasing v. P.R.L. Hardenbergh Co.,* 303 Minn. 41, 226 N.W.2d 110 (1975). These cases are in keeping with § 288C of the *Restatement (Second) of Torts* (1965), which states that "[c]ompliance with a legislative enactment or an administrative regulation does not prevent a finding of negligence where a reasonable man would take additional precautions." In view of the highest degree of care required of propane suppliers with respect to the sufficient odorization of their product, we conclude that compliance with an administrative safety regulation does not conclusively establish that the highest degree of care was exercised, but is merely one circumstance to be considered in determining whether there is sufficient evidence to submit a negligence claim to the jury.

■ Although the defendants in this case presented evidence showing that the amount of ethyl mercaptan satisfied and indeed exceeded the requirements of Regulation B.1, the plaintiffs presented evidence, albeit circumstantial, that rendered the question of compliance a controverted issue of fact. In particular, we refer to the failure of the plaintiffs, Billy Van Hoose, and Billy's wife to smell any odor of escaping gas in the home at any time prior to the explosion, and the inability of Rudy Stanley, an employee of Blueflame, to smell any odor of gas when he examined the hot water heater and its gas line the day after the explosion. Moreover, even if the evidence on compliance had been uncontroverted, other evidence in the record precluded any determination that the defendants as a matter of law exercised the highest degree of care with respect to the odorization of propane. Although ethyl mercaptan has a known tendency to break down and dissipate under certain circumstances, neither Diamond Shamrock, the wholesaler, nor Phillips, the distributor, took any action to insure the chemical integrity of the ethyl mercaptan stored at the La Junta terminal prior to using it as an odorizing agent. Nor was there any testing at the La Junta terminal for effective odorization after the propane had been loaded into the tanker trucks of retail distributors. Nor, finally, did Blueflame make any tests for effective odorization of the propane sold to the Van Hooses on May 5, 1972. This evidence, when viewed under the appropriate standard, *e.g., Gossard v. Watson,* 122 Colo. 271, 221 P.2d 353 (1950), clearly refutes the defendants' argument that they were entitled to a directed verdict on the plaintiffs' claim in negligence.

### B.

■ Turning to the effect of regulatory compliance on the plaintiffs' strict liability claim for sale of a defective product, we similarly conclude that compliance does not conclusively establish that the propane sold to the plaintiffs was not defective. Because the focus in a strict liability claim is on the product itself, and not on the degree of care employed by the seller or distributor of the product, *e.g., Hiigel v. General Motors Corp., supra; Kinard v. Coats Co., Inc., supra,* it obviously follows that a product may be in a defective condi-

tion unreasonably dangerous to the user or consumer notwithstanding the supplier's compliance with a safety regulation related to that product. While undoubtedly compliance constitutes evidence that the product was not defective at the time of sale, it by no means is conclusive on the issue of defect.[11]

Although the defendants presented evidence showing that a Phillips employee had added ethyl mercaptan to the propane delivered to Blueflame in a ratio of 1.5 pounds per 10,000 gallons, this evidence was contested by contrary circumstantial evidence and, even if uncontested, would not amount to conclusive evidence of the absence of any odorization defect in the propane when it was later sold by Blueflame to the Van Hooses. Ethyl mercaptan, as previously noted, has a potential for dissipation, absorption, and masking under a variety of circumstances. Effective odorization, therefore, could not occur unless the ethyl mercaptan was chemically sound.

The state of the record, however, is far from conclusive on the chemical integrity of the ethyl mercaptan added to the propane in question. More important, as in the case of the negligence claim, the evidence of the lack of any gaseous odor in the house prior to the explosion and the evidence of the lack of any odor in the propane emitted from the gas line on the day following the explosion were sufficient to warrant a reasonable inference that the propane was not sufficiently odorized to be perceptible to the normal sense of smell when it escaped and accumulated in the Van Hoose basement prior to the explosion. When all the evidence is viewed in a light most favorable to the plaintiffs and all reasonable inferences therefrom are drawn in their favor, as we must, *e.g., Gossard v. Watson, supra,* we are satisfied that the evidence, rather than conclusively establishing the absence of a defect, was sufficient to require the submission of the plaintiffs' strict liability claim under § 402A to the jury.[12]

11. The defendants, in urging a contrary result, have placed substantial reliance on *Jones v. Hittle Service, Inc.,* 219 Kan. 627, 549 P.2d 1383 (1976), for the proposition that compliance with Regulation B.1 exonerates them as a matter of law from any liability to the plaintiff under either negligence or strict liability principles. We, however, find the facts in *Jones* sufficiently distinguishable from those present here and, more important, its reasoning unsatisfactory in light of the extremely dangerous character of inadequately odorized propane. In *Jones,* a propane explosion occurred on the farm of Homer and Ethelda Smith near Mulvane, Kansas. Prior to the explosion Mrs. Smith had reported a "strange smell" in the cellar but believed that it was caused by a dead mouse. Actually, propane had leaked from a gas line, seeped through an intervening foot or two of earth, and had collected in the cellar. When Mrs. Smith's son-in-law, Kenneth Jones, subsequently attempted to light a cigarette in the cellar, an explosion occurred, resulting in the death of Mrs. Smith, Mr. Jones, and his wife, Nadine Jones. In an action against the manufacturer, bulk supplier, and retail distributor, it was stipulated that the propane had been odorized to a level that complied with the applicable legislative safety standard. The Kansas court held that "[c]ompliance is evidence of due care and that the conforming product is not defective, and may be conclusive in the absence of a showing of special circumstances." 219 Kan. at 632, 549 P.2d at 1390. The court then, after examining the record, de-

termined that there was "no substantial evidence which would have supported a finding that the explosion was caused by an inadequate level of odorant in the gas." 219 Kan. at 634, 549 P.2d at 1391.

As we have already noted, the record in the instant case furnishes evidence sufficient to support a reasonable inference of inadequate odorization of the propane. Moreover, since the Kansas court did not characterize propane as a dangerous substance requiring the highest degree of care, we find their analysis inapposite to this case. Although we have acknowledged that compliance with a safety standard is some evidence of due care and lack of defect, we do not view compliance, by itself, sufficient to *conclusively establish,* at least under the record before us, the "highest degree of care" or the lack of defect with respect to the odorization of the propane.

12. We note that section 13–21–403, C.R.S.1973 (1983 Supp.), which became effective July 1, 1977, provides in pertinent part:

"(1) In any product liability action, it shall be rebuttably presumed that the product which caused the injury, death, or property damage was not defective and that the manufacturer or seller thereof was not negligent if the product:

\* \* \* \* \* \*

(b) Complied with, at the time of sale by the manufacturer, any applicable code, stan-

The judgment of the court of appeals is affirmed.

KIRSHBAUM, J., does not participate.

dard, or regulation adopted or promulgated by the United States or by this state, or by any agency of the United States or of this state." Although this statute, which creates a rebuttable presumption, is not applicable to the 1972 explosion involved in this case, we do not view our decision as contrary to the statute. Our holding here is simply that the compliance issue was a controverted question of fact and that compliance was only one circumstance to consider on the issue of liability.